**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**April 14, 2003**

Charles R. Fulbruge III
Clerk

REVISED APRIL 28, 2003

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-60285
_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

        versus

JAMES ORIN OGLE,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

Before GARWOOD, SMITH and BARKSDALE, Circuit Judges.

GARWOOD, Circuit Judge:

        James Ogle appeals his conviction and sentence for conspiring

to launder monetary instruments and laundering monetary instruments

in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(3)(B), (C).  Ogle

was charged in a two-count indictment arising from an agreement to

launder money represented to be the proceeds of drug smuggling. He was subsequently convicted by a jury on both counts and sentenced to concurrent terms of 121 months' imprisonment followed by three years' supervised release. For the reasons set forth below, we affirm the conviction, vacate the sentence, and remand for re-sentencing.

## Background

Ogle, an Atlanta businessman, was arrested as part of a reverse-sting operation conceived and orchestrated by Wendell Blount, a confidential informant for the United States Customs Service acting under the direction of Customs Service Special Agent Michael Tyson. The sting operation began after Blount was directed by acquaintances to Casey Hemmings as someone "could get some money cleaned up" for him.

Based on that referral, Blount and Special Agent Tyson agreed to contact Hemmings with a proposal to launder a fictitious twelve million dollars in cash that Blount decided to describe to Hemmings as the proceeds of illegal narcotics smuggling. Upon returning to Mississippi, Blount contacted Hemmings and arranged to meet him in a Biloxi hotel room to discuss the proposed transaction. After arranging for Customs Service surveillance of the meeting, Blount met Hemmings on March 3, 2001. During that meeting, Blount revealed the fictitious details of the source of the cash, and Hemmings, although initially apprehensive about the matter, agreed

to handle the proposed money laundering transaction for Blount.[1] At their meeting, Hemmings also informed Blount that the transaction would be handled in part by Hemmings's business partner, James Ogle. Hemmings subsequently told Blount that he had explained the matter to Ogle and that Ogle was entirely receptive to it.

Following their first meeting, Hemmings continued to contact Blount to arrange the details of the transaction, and on March 28, 2001, Hemmings introduced Ogle to Blount. At a meeting on March 28th, Ogle presented Blount with a number of proposals for laundering the fictitious cash, despite only thinly veiled indications from Blount that the cash represented the proceeds of narcotics smuggling. Later, when Hemmings, initially a central figure in the scheme, assumed a less active role following his arrest on an unrelated matter in Florida, Ogle took over the planning of the transaction.

After some delay during which Ogle repeatedly telephoned Blount, pressuring Blount to complete the deal, Ogle and Blount eventually agreed that Ogle would pick up the cash in the parking

---

[1] Any reluctance to participate in the transaction on Hemmings's part appeared to be driven less by an unwillingness to engage in illegal activity, and more by a fear of law enforcement and of other risks related to becoming involved, even tangentially, with large-scale narcotics smuggling. Hemmings repeatedly referred to the risk of "being set up," and at one point during their initial meeting, even insisted on searching Blount; at another point, Hemmings expressed concern that a third party might come looking for the laundered money.

lot of a Biloxi, Mississippi, casino.  When Ogle arrived in Biloxi on May 30, 2001, accompanied by an armed escort, to take possession of the fictitious twelve million dollars, he not only found that the cash did not actually exist, but also found himself facing arrest at the hands of a team of Customs agents.

## Discussion

Ogle assigns as error three rulings of the district court: the district court's refusal to instruct the jury on the defense of entrapment; the exclusion of the proffered testimony of Ogle's expert witness; and the district court's refusal to consider a three-level reduction of Ogle's sentence under the general conspiracy provision of the sentencing guidelines.  We address each point of error in turn and conclude that only the third, the calculation of Ogle's sentence under the guidelines, has merit.

A.  Entrapment

Where there is an evidentiary foundation for a theory of defense that, if credited by the jury, "would be legally sufficient to render the accused innocent," it is reversible error to refuse a charge on that theory.  *United States v. Schmick*, 904 F.2d 936, 943 (5th Cir. 1990).  Thus, "when a defendant's properly requested entrapment instruction is undergirded by evidence sufficient to support a reasonable jury's finding of entrapment, the district court errs reversibly by not adequately charging the jury on the theory of entrapment."  *United States v. Bradfield*, 113 F.3d 515,

4

521 (5th Cir. 1997). Accordingly, we review *de novo* the refusal to instruct the jury on the defense of entrapment. *Id.*

"The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with the government agents." *Id.* at 521. That the Government provided the opportunity for Olge to commit the offense of money laundering by employing a confidential informant and fabricating the existence of the money to be laundered does not, in itself, entitle Ogle to an entrapment instruction. "[T]he Government may use undercover agents to enforce the law," and "artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Jacobson v. United States*, 112 S.Ct. 1535, 1540 (1992). Entrapment only arises, rather, where the Government, in its "zeal to enforce the law," "implant[s] in an innocent person's mind the disposition to commit a criminal act, and then induce[s] commission of the crime so that the Government may prosecute." *Id.* Before he will be entitled to an entrapment defense, therefore, the defendant bears the burden of presenting evidence of both "(1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial that simply providing an opportunity or facilities to commit the offense." *Bradfield*, 113 F.3d at 521.

After reviewing the record, we conclude that the district court did not err in refusing an entrapment instruction. We find

that Ogle failed to satisfy his initial evidentiary burden, producing substantial evidence neither of a lack of predisposition to commit the offense of money laundering, nor of government actions that amounted to more than simply providing him with the occasion to launder money.

Ogle does not point to any evidence in the record indicating a lack of predisposition to engage in money laundering, nor does a review of the record indicate that Ogle established that he lacked the necessary predisposition to commit the offense.[2]  On the contrary, the uncontradicted record reflects that Ogle, far from being a reluctant party to the proposed transaction, was a keen participant in the conspiracy, eager to see the transaction consummated.[3]  Ogle arrived at his first meeting with Blount

---

[2]  Neither Ogle nor Hemmings testified.  Ogle did attempt to introduce the testimony of a financial expert who was prepared to testify that Ogle lacked the positional predisposition to engage in money laundering.  As discussed *infra*, however, the district court properly excluded that testimony and it cannot, therefore, be relied upon to satisfy Ogle's burden of producing evidence establishing a lack of predisposition.

[3]  In his brief, Ogle places great weight on the assertion that the Government presented no evidence to show that he knew of the illegal nature of the proposed transaction before meeting Blount in Mississippi.  That assertion, even if true, however, does not establish a lack of predisposition.  Rather, it merely indicates the extent to which Ogle misapprehends his burden of producing evidence of a lack of predisposition.  To say that the Government failed to show that Ogle knew of the putatively illegal source of the funds before meeting with Blount does not demonstrate that Ogle satisfied his initial burden of producing more than a scintilla of evidence of a lack of predisposition. Ogle's predisposition is a question independent of the question of when he learned that the fictional cash represented the proceeds of unlawful activity.

prepared to offer a number of options for laundering the fictional cash, including a proposal to pay a Turkish diplomat ten percent of the funds to transport the cash out of the United States and deposit it in Turkey, and a proposal to pay a development company that routinely deposited large sums of cash to deposit and then transfer the illicit funds.[4]  Such demonstrated knowledge of the details of international money laundering alone is enough to establish predisposition.  *See Reyes*, 239 F.3d at 739 (listing a "demonstrated knowledge or experience with the criminal activity

---

Moreover, Ogle's argument that he did not know that the funds were the proceeds of narcotics smuggling evinces a misunderstanding of the *mens rea* necessary for a conviction under § 1956.  A conviction for money laundering does not require that the defendant know the precise source of the illegal funds, but only that the defendant know that the funds are "proceeds of *some form of illegal activity*."  18 U.S.C. § 1956(a)(1) (emphasis added); *see also* § 1956(c)(1) (must know that "the property involved . . . represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7)"); S.Rep. No. 99-433, at 12 (1986) ("[T]he defendant need not know exactly what crime generated the funds involved in a transaction, only that the funds are the proceeds of some kind of crime that is a felony under Federal or State law.  This will eviscerate the defense that a defendant knew the funds came from a crime, but thought the crime involved was a crime not on the list of 'specified' crimes in section (c)(7).").

[4]  Ogle's apparent ease in discussing these various proposals indicates a degree of familiarity with money laundering sufficient to support the conclusion that he was predisposed to engage in money laundering.  His reference to the Turkish diplomat's prior smuggling efforts, for example, suggests that Ogle, even if not having previously engaged directly in the smuggling of currency, was, at a minimum, familiar with the process.

7

under investigation" as one of a number of factors tending to prove predisposition).  The suspect nature of these proposals reflects that Ogle prepared in advance for the meeting despite at least some awareness of the nature of the proposed transaction.  Moreover, there is absolutely *no* evidence that Ogle did *not* know of the illegal nature of the proposed transaction before his initial meeting with Blount.  Because, "a defendant's ready and willing participation in government-solicited criminal activity, standing alone, is sufficient to prove predisposition," this uncontradicted, unimpeached evidence also provided an adequate basis for the district court to deny an entrapment instruction. *Id*. At no point did Ogle display any hint of hesitation or unwillingness to enter into the conspiracy. *See, e.g.*, *United States v. Fischel*, 686 F.2d 1082, 1086 (5th Cir. 1982) (noting that a single act of hesitation, easily overcome, is insufficient to establish inducement). Rather, the uncontradicted evidence reflects that Ogle continued to plan and to pursue aggressively the proposed transaction even after learning of the illegal source of the cash.  Thus, when the transaction appeared on the verge of foundering, Ogle repeatedly contacted Blount seeking to revive the deal, calling as often as six times in as many days.  *Cf. Bradfield*, 113 F.3d at 522–23 (finding that a defendant had made a showing of a lack of predisposition where it was the government agent, not the defendant, who called repeatedly seeking to consummate the criminal

transaction).

Not only is it clear that Ogle failed to produce evidence of a lack of predisposition, but he also failed to establish that his involvement in the proposed money laundering transaction was the product of government inducement. "The conduct with which the defense of entrapment is concerned is the manufacturing of crime by law enforcement officials and their agents." *United States v. Garcia*, 546 F.2d 613, 615 (5th Cir. 1977) (quoting *Lopez v. United States*, 83 S.Ct. 1381, 1385 (1963)). Although the Government initiated contact with Hemmings and may, therefore, be considered the immediate cause of the conspiracy, there is no substantial evidence that it was the Government that implanted in Ogle's mind the disposition to commit a criminal act. *See Jacobson*, 112 S.Ct. at 1540 (1992).

In denying Ogle's request for an entrapment instruction, the district court, relying on *United States v. Sarmiento*, 786 F.2d 665, 667 (5th Cir. 1986), found that Ogle could not, as a matter of law, have been entrapped, as any inducement to commit the offense came not from a government actor, but from Ogle's co-conspirator, Hemmings. According to the district court, that Ogle "initially entered into the conspiracy to launder money at the encouragement of Hemmings and not a government agent effectively barred [Ogle]

from raising the entrapment defense."[5]  Ogle consequently focuses

his efforts on appeal on refuting the Government's assertion that

Ogle's inducement to enter into the conspiracy came from Hemmings

and not from the Government's informant.

Those efforts, however, are of insufficient effect.  Even if

Ogle is correct in his highly questionable assertion that there is

no evidence that he *was* made aware that the fictitious funds had

some illegal source until he met Blount, that fact, standing alone,

does not suffice to raise entrapment.  Hemmings was made aware that

the funds had an illegal source, he thereafter brought Ogle into

the matter, and there is *no* evidence that Ogle, just before his

initial meeting with Blount, at which Ogle arrived full of

suggestions, was *un*aware that the funds had an illegal source.  It

is Ogle's burden to raise the entrapment defense.  Moreover, even

if there had been evidence that Ogle first learned there was an

illegal source and the purpose of the proposed transaction from the

confidential informant, such evidence would do nothing more than

establish that the Government afforded Ogle with the facilities for

the commission of a crime, a fact that, by itself, does not entitle

Ogle to an entrapment instruction.  More is required before a

---

[5]  *See United States v. Sarmiento*, 786 F.2d 665, 668 (5th
Cir. 1986) (recognizing that "[t]his circuit has not adopted the
'unsuspecting middleman' theory of entrapment" ); *United States
v. Garcia*, 546 F.2d 613, 615 (5th Cir. 1977) ("Entrapment cannot
result from the inducements of a private citizen but must be the
product of conduct by governmental agents.").

defendant is entitled to an entrapment instruction.

To satisfy his burden of producing evidence of government inducement, Ogle was required to present not just a smattering or a scintilla of evidence of government inducement, but substantial evidence that it was the Government that was responsible for the formation of Ogle's intent to join the conspiracy. *See Bradfield*, 113 F.3d at 521. Ogle points to no such evidence of inducement on appeal, and an independent review of the record reveals none.

Because we find that Ogle failed to produce substantial evidence of either government inducement or a lack of predisposition to commit the crime of money laundering, we find no error in the district court's refusal to instruct the jury on the entrapment defense.

B. Expert Testimony

In his second point of error, Ogle maintains that the district court erred in excluding both evidence of his general financial condition as well as the proffered testimony of a defense expert on the nature of Ogle's financial position. "[T]he admissibility of expert testimony is a matter which rests within the broad discretion of the trial judge and his decision is not to be disturbed unless it is manifestly erroneous." *United States v. Lopez*, 543 F.2d 1156, 1158 (5th Cir. 1976). We therefore review a district court's decision to exclude expert testimony only for an abuse of discretion. *United States v. Triplett*, 922 F.2d 1174,

11

1182 (5th Cir. 1991).

At trial, Ogle sought to offer the expert testimony of Shirley Lindsay, a former IRS Special Agent and fraud examiner. At a hearing conducted outside the presence of the jury, Lindsay opined on Ogle's deteriorating financial situation as it related to his ability to engage in a large-scale money laundering transaction, and concluded that, in her estimation, Ogle lacked the "positional predisposition to commit any crime, let alone money laundering." The district court, however, found that the proffered expert testimony would be of little assistance to the jury, and excluded it.[6] We find no abuse of discretion in that decision.[7]

---

[6] After listening to Lindsay's proposed testimony, the district court concluded, "[T]he basis of [Lindsay's] testimony . . . is rather simplistic. She is saying that [Ogle] could not commit the crime because he was in a financial dilemma. Essentially . . . that's what Ms. Lindsay is saying. I don't think that would be of any assistance to the jury."

[7] Ogle also characterizes, for the first time on appeal, the district court's decision to exclude Lindsay's testimony as a general prohibition of the introduction of any evidence of Ogle's financial position. Having set up such a straw man, Ogle then proceeds to tear it down. Specifically, Ogle argues that because it demonstrates that his involvement in the conspiracy was driven not by a predisposition to engage in crime, but by financial pressure, evidence of his deteriorating financial position was relevant to the defense of entrapment and its exclusion was error.

A fatal flaw in Ogle's argument is that the district court never prevented Ogle from introducing general evidence of his financial condition. Ogle offered Lindsay as an expert on the question of positional predisposition, and the court's ruling was limited accordingly, excluding only Lindsay's conclusion that Ogle lacked the positional predisposition to commit the offense of money laundering. At no point did Ogle seek to introduce other evidence of his financial straits, as motive for his joining the conspiracy or otherwise, and the district court never

The concept of positional predisposition has its origins in the Seventh Circuit's opinion in *United States v. Hollingsworth*, in which that circuit concluded that the concept of predisposition has both a positional and a dispositional element. 27 F.3d 1196, 1200 (7th Cir. 1994). To be positionally predisposed to commit a crime, "[t]he defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the Government had not induced him to commit the crime some criminal would have done so." *Id*. The doctrine, however, is a controversial one, *see, e.g.*, *United States v. Thickstun*, 110 F.3d 1394, 1398 (9th Cir. 1997) (rejecting the concept of positional predisposition), and one that we have, thus far, declined to recognize. *See United States v. Reyes*, 239 F.3d 722, 742 (5th Cir. 2001); *United States v. Wise*, 221 F.3d 140, 155–56 (5th Cir. 2000).

As we did in *Reyes* and in *Wise* we also find it unnecessary here to recognize the doctrine of positional predisposition. Even had Lindsay's expert opinion testimony been admitted into evidence, Ogle could still not have established that he was not positionally predisposed to engage either in a conspiracy to commit money laundering or to commit the substantive offense of money laundering.

---

clearly ruled that it would have excluded such evidence. Thus, Ogle waived any complaint as to exclusion of evidence of his financial condition when he failed to offer any evidence of his financial situation apart from his general tender of Lindsey's testimony as a whole. *See* FED. R. EVID. 103(a)(2).

13

It will be the rare case indeed where a defendant can establish a lack of positional predisposition to join in a conspiracy, and we can conclude that Ogle's is not such a case. Ogle failed to offer any evidence that he was not positionally predisposed to join in a conspiracy. The gravamen of a conspiracy is the agreement to engage in unlawful activity, *see United States v. Holcomb*, 797 F.2d 1320, 1327 (5th Cir. 1986). Ogle's supposed inability actually to himself launder money has little bearing on his ability to agree to assist in that endeavor. That Ogle by himself could not personally have laundered the money is, therefore, no defense to a charge that Ogle conspired with others to have the money laundered.

Similarly, Lindsay's testimony would not have been sufficient to establish that Ogle was not positionally predisposed to commit the substantive offense of laundering money. Whether Ogle had the personal financial resources to by himself conduct a large-scale money laundering transaction is not determinative of the issue of his positional predisposition to engage in actual money laundering.

Ogle's positional predisposition to launder money is perhaps best illustrated by contrasting his situation to that of the defendants in *Hollingsworth*. In *Hollingsworth*, the Seventh Circuit concluded that the defendants, newcomers to the banking business, did lack the positional predisposition to launder money. *Hollingsworth*, 27 F.3d at 1202. Unlike the defendants in

14

*Hollingsworth*, a farmer and an orthodontist who were relative novices in the financial world,[8] Ogle was a sophisticated businessman who, despite having fallen on difficult times, was well versed in complex financial transactions and was in a position to take advantage of both his personal experience and the experience of his business contacts.  And although, like Hollingsworth, Ogle did not have an "up-and-running bank" and may not have had sufficient assets with which to accomplish the laundering money, he did have the necessary financial connections and business acumen to get the money laundered.  *See, e.g.*, *Hollingsworth*, 27 F.3d at 1200 (describing one who is positionally predisposed as one who has the necessary occupation or acquaintances to make the commission of the crime possible).  Accordingly, Ogle's proposed plans to launder the money involved the use not of his own financial resources, but of those of a third party or parties, and his role in the proposed money laundering transaction was that of a broker, one responsible for the picking up and transportation of the cash in order to take advantage of the assets of a third party or parties.

The defense presented no evidence establishing that Ogle's lack of financial resources would have prevented him from laundering the money by transferring it to a third party or parties

---

[8]  *See Hollingsworth*, 27 F.3d at 1200 (describing the defendants' misguided attempts "to become international financiers—a vocation for which neither had any training, contacts, aptitude, or experience").

who did have the necessary assets to deposit twelve million dollars in cash without unduly arousing suspicion, and there is no evidence Ogle lacked information concerning or access to such parties (as he maintained to Blount that he had). We conclude, therefore, that Ogle's proposed expert testimony could not have established a lack of positional predisposition, and that its exclusion, therefore, was not an abuse of discretion.

C. Sentencing

In his final point of error, Ogle challenges his sentence, arguing that the district court erred in not considering a three-level reduction of his guideline offense level under section 2X1.1(b) of the sentencing guidelines.

Following Ogle's conviction, the district court declined to consider granting Ogle a requested three-level reduction, reasoning only that section 2X1.1 did not apply to offenses under section 1956, as the commentary included with section 2X1.1 listed only offenses under 18 U.S.C. §§ 371, 372, and 2271. However, upon reviewing the district court's interpretation of the sentencing guidelines *de novo*, *see United States v. Heffron*, 314 F.3d 211, 224 (5th Cir. 2002), we agree with Ogle's conclusion that the district court erred in not considering the availability of a three-level reduction under section 2X1.1(b).

Sections 1B1.2(a) and 2X1.1 clearly direct that section 2X1.1 shall be applied to attempts, conspiracies, and solicitation unless

the specific attempt, conspiracy, or solicitation is expressly covered by the guideline for the substantive offense. *See* U.S.S.G §§ 1B1.2(a), 2X1.1(c)(1) (2000); *United States v. Villafranca*, 260 F.3d 374, 381 (5th Cir. 2001). The Government, however, now maintains that section 2X1.1 was inapplicable for two reasons. First, the Government argues that the jury found Ogle guilty not of attempting to launder money, but of the completed offense of money laundering. Second, the Government maintains, in a position advanced for the first time at oral argument, that section 2X1.1 does not apply to offenses under section 1956, since the offense guideline for money laundering, section 2S1.1, expressly covers attempts and conspiracies to commit money laundering. We find both arguments unpersuasive. We initially note that neither contention was addressed below by either party, or by the Presentence Report or the district court. The Presentence Report simply took the position, with which the Government and the district court agreed, and to which Ogle objected, that section 2X1.1 did not apply to *any* section 1956 conviction. That position is erroneous as reflected by our opinion in *Villafranca*.

The Government first argues that Count Two of the indictment and the instructions to the jury authorized conviction on that count for both the attempt to complete and the actual completion of a money laundering transaction. The general verdict of guilty on that count does not reveal which the jury found. Moreover, the

17

record also indicates, and the Government conceded at oral argument, that the Government largely argued its case to the jury as an attempt case.  Had the jury clearly convicted Ogle only of the completed offense of money laundering, then guideline section 2S1.1 would have properly applied.  Given the manner in which the Government presented its case, and in the absence of any finding from either the jury or from the district judge at sentencing that Ogle's conviction was based on a completed offense of money laundering, we decline to now  hold that section 2S1.1 was properly applied.

The Government's second argument, that section 2S1.1 expressly covers attempts and conspiracies, is not only tardy,[9] but is also wholly without merit.  The Government's position at oral argument that section 2S1.1 expressly covers attempts and conspiracies was based on reference to subsections of section 2S1.1 not in existence at the time Ogle was sentenced.  Specifically, the Government's entire argument before the panel on this point was based on an amended version of section 2S1.1 that did not become effective

---

[9]  We will generally not consider points raised for the first time at oral argument. *United States v. Ulloa*, 94 F.3d 949, 952 (5th Cir. 1996).  The Government raised this position neither at sentencing nor in its brief.  The Government, however, attempted at oral argument to characterize this contention as a mere "expansion" of a position advanced in its brief.  This effort, however, is somewhat disingenuous.  Nowhere in its brief does the Government advance the argument that § 2S1.1 expressly covers attempts and conspiracies.  The closest the Government comes to advancing this position is a statement that the district court was permitted, but was not required, to apply § 2X1.1.

until November of 2002, nine months after Ogle's sentencing. The version of section 2S1.1 in effect at the time of Ogle's sentencing contains no reference whatsoever to either attempts or conspiracies. Accordingly, the district court should have referred to section 2X1.1 in computing Ogle's sentence. *See United States v. Villafranca*, 260 F.3d 374, 381 (5th Cir. 2001).

Finally, the Government argues that any error in not applying guideline section 2X1.1 was harmless as Ogle had completed all acts he believed necessary to consummate the money laundering conspiracy at the time of his arrest. Guideline section 2X1.1(b)(1) does provide that a three-level reduction is not available where, "but for apprehension and interruption by some . . . event beyond the defendant's control," the defendant would have completed the substantive offense. U.S.S.G. § 2X1.1(b)(1). The Government is, therefore, correct that "there is no difference between the Guidelines calculation for conspiracy [to launder money] and [money laundering] when the evidence accepted by the sentencing court shows that the conspiracy's objectives were actually [or substantially] completed." *Villafranca* at 381. This contention was not made below, and neither the Presentence Report nor the district court concluded that the money laundering scheme was (or was not) substantially completed at the time of Ogle's arrest, nor did either party present any evidence at sentencing to establish that the offense was, in fact, substantially complete. Under these

19

circumstances, we cannot on this appeal accept the Government's position that any error in refusing to apply section 2X1.1 was harmless.

Accordingly, Ogle's case must be remanded to the district court to address, consistently with this opinion, the applicability and effect of section 2X1.1.

## Conclusion

For the reasons assigned, the judgment of conviction is AFFIRMED, the sentence is VACATED, and the case is REMANDED for resentencing.