**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 14, 2003**

**Charles R. Fulbruge III**
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-50668
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARTHUR GUTIERREZ, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Western District of Texas

_____

Before GARWOOD and HIGGINBOTHAM, Circuit Judges, and FELDMAN, District Judge.[*]

PATRICK E. HIGGINBOTHAM, Circuit Judge:

After a reverse-sting operation devised by the FBI to target various members of the San Antonio Police Department willing to commit crimes for money, a grand jury indicted Arthur Gutierrez, Jr., a fifteen-year veteran of the police force, for various drug offenses. The indictment charged Gutierrez with one count of conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine, two counts of attempting to aid and

_____

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

abet the distribution and possession with intent to distribute of five kilograms or more of cocaine, and with two counts of knowingly carrying a firearm during and in relation to a drug trafficking crime. The case against Gutierrez proceeded to trial, but during deliberations the jury deadlocked and the district court declared a mistrial. Upon retrial a jury acquitted Gutierrez of all counts except for one count of aiding and abetting distribution and possession with intent to distribute. The district court sentenced Gutierrez to 180 months' imprisonment and five years' supervised release. Gutierrez now appeals his conviction, and we affirm.

I

The evidence showed that after receiving information that officers of the San Antonio Police Department would commit crimes in exchange for money, the FBI commenced a reverse-sting operation centered around Ricardo Pagan, an undercover agent posing as a mid-level drug dealer. Pagan offered San Antonio police officers opportunities to provide security for various drug transactions Pagan would orchestrate. Pagan's practice was that, prior to the jobs, he would meet with an officer and tell him in no uncertain terms the specific nature of the transaction and the amount of cocaine involved. He also explained to the officers that he did not carry a gun and wanted them because they had "badges and guns," and could "run interference" with any of his competitors who might attempt to pose as cops and rip him off or with actual law enforcement officers who might stop his drug couriers during a drug

-2-

run.

Pagan requested that the officers act as security in one of two transactions. The first type, the "escort scenario," involved a load vehicle that transported fake cocaine to a specific destination. Pagan would arrange for two police officers, one in the lead car and the other in the trail car, to escort the load vehicle to the point of arrival, usually a place outside of San Antonio. The second type, the "protection transaction," was contained in Pagan's hotel room. Pagan would call his courier – another undercover agent – to bring the fake cocaine to the room. In the presence of the participating officers, Pagan would unpack it, display it, and then repack it. The courier would leave and Pagan would hide the cocaine in another room, make a call to the "buyer," and have the buyer's courier come to the hotel room to pick up the drugs. Pagan again involved two officers, requesting that one stay in the room to provide security while the other wait in the parking lot of the hotel to notify Pagan when the buyer's courier arrived and to confirm whether that courier was alone or being followed. FBI agents situated in an adjoining hotel room recorded on video and audio every transaction and meeting Pagan held in his hotel room.

The first mention of Gutierrez to Pagan came on July 21, 2000, after Pagan had already conducted several transactions using Conrad Fragozo, a sergeant on the police force, and other officers Fragozo

had invited in.[1]  Pagan called Fragozo to ask if he knew of any other officers who might want to participate, and Fragozo responded that he had an academy buddy he had known for fifteen years, later identified by Fragozo as Gutierrez.  Gutierrez testified that on August 21, 2000, Fragozo approached him about doing a job for a businessman from Chicago who wanted his stripper girlfriend trailed because he feared she was cheating on him.  Gutierrez agreed to the job, and Fragozo set up a meeting for the next day so that Gutierrez could meet the businessman.  Gutierrez explained that once he arrived at Pagan's hotel room, Pagan and Fragozo revealed the true nature of the job, which was to act as security for drug deals.  Pagan stated that he needed twenty-five kilograms of cocaine transported and wanted Gutierrez to escort the shipment. Gutierrez responded, "No problem.  Sounds easy enough."

Pagan and Gutierrez arranged to meet back at the hotel room at ten-thirty the next morning, August 23, for the escort.  Even though Gutierrez had to work an all night patrol shift, he stated, "I am up for it."  Fragozo pointed out that Gutierrez was scheduled to work security during the daytime for the Alamo Cafe, to which Gutierrez replied that that was not a problem and he could get someone else to work that shift.  Pagan testified that he attempted to give Gutierrez an opportunity not to participate by telling him, "If you ever decide, hey, I am done with this, just tell me,

---

[1] According to Pagan, Fragozo had no knowledge that Pagan was conducting a reverse-sting operation.

because I am not forcing anyone to do anything." However, Gutierrez chose to go forward with the transaction, stating, "Sounds good to me. Give me a call early on the arrangements, so I have time to get over here."

On August 23, Gutierrez met Fragozo and Pagan and assisted in the drug escort. Two undercover agents posing as drug couriers escorted the twenty-five kilograms of cocaine to a hotel in Schwertz, Texas, about a half an hour away. Carrying a firearm, Gutierrez drove the trail vehicle, and after he returned, Pagan paid him $2500. Pagan asked if the amount was fair. Gutierrez said it was. Pagan asked if Gutierrez would be willing to do it again and Gutierrez said he would.

About a month later, on September 20, 2000, Pagan had Fragozo contact Gutierrez about the possibility of assisting with a protection transaction. Gutierrez agreed, and met them on that date to plan. On the following day, Gutierrez arrived carrying his service weapon and was present when Pagan's courier dropped off fifteen kilograms of fake cocaine and Pagan unpacked and repacked it. Pagan then instructed Gutierrez to surveil the hotel parking lot and watch for the buyer's courier, which Gutierrez did after asking for a description of the vehicle the courier would be driving. Gutierrez alerted Fragozo, who was in the hotel room, to the courier's arrival. After the conclusion of the transaction Gutierrez again received $2500. Fragozo never contacted Gutierrez about any further transactions.

Gutierrez was indicted in March 2001. He raised three defenses at trial. First, he argued that his initial participation in the conspiracy was motivated by fear for his life. Second, he asserted that he continued to participate in the scheme in order to obtain more information about the drug smuggling as part of his own investigation into Pagan and Fragozo's activities, an investigation that he maintained he did not report to his superiors for fear that they might also be involved in the illegal activity.[1] Gutierrez also sought to raise the defense of entrapment.

The trial judge included a duress instruction but declined to instruct on entrapment. The jury acquitted Gutierrez of conspiracy and of the counts drawn from the August 23 transaction, which included one count of attempting to aid and abet and a count of carrying a firearm during a drug trafficking offense. It also acquitted him of the charge of carrying a firearm during the September 21 transaction. However, the jury convicted Gutierrez for attempting to aid and abet for his role in the September 21 transaction.

II

Gutierrez first asserts that the district court reversibly erred in refusing to give an entrapment instruction to the jury. During the first trial Gutierrez's attorney requested only an

---

[1] When Gutierrez was ultimately arrested — several months after he initially met Pagan — he still had yet to report his investigation either to any other officer in the police department or to any other agency.

instruction on duress. His counsel requested an entrapment instruction in the second trial. The trial judge denied defendant's requests for "supplemental instructions" during the second trial on the basis that they either were not supported by the evidence or because they were sufficiently covered in the proposed instructions.[1]

We review *de novo* a trial court's refusal to instruct the jury on the defense of entrapment.[2] We have recently reminded that "[w]here there is an evidentiary foundation for a theory of defense that, if credited by the jury, would be legally sufficient to render the accused innocent, it is reversible error to refuse a charge on that theory."[3] Therefore, "'when a defendant's properly requested entrapment instruction is undergirded by evidence sufficient to support a reasonable jury's finding of entrapment, the district court errs reversibly by not adequately charging the jury on the theory of entrapment.'"[4]

The core question regarding entrapment is whether the criminal intent originally resided in the defendant; in other words, whether

---

[1] The instructions given did not mention entrapment. Therefore, we assume the district court refused to instruct the jury on entrapment because it did not believe sufficient evidence existed in the record to warrant the defense.

[2] *United States v. Ogle*, 328 F.3d 182, 185 (5th Cir. 2003).

[3] *Id.* (internal quotation marks omitted).

[4] *Id.* (quoting *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997)).

-7-

the government planted the seed of criminality, or instead whether the defendant was willing to perpetrate the offense and the government simply provided the opportunity.[5]  "Entrapment only arises ... where the Government, in its 'zeal to enforce the law,' 'implant[s] in an innocent person's mind the disposition to commit a criminal act, and then induce[s] commission of the crime so that the Government may prosecute.'"[6]  Therefore, to be entitled to an entrapment instruction, a defendant bears the burden of presenting evidence of "'(1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense.'"[7]

Gutierrez's claim for an entrapment instruction founders on the government inducement prong of the entrapment defense.  He argues that government inducement was evident in two ways: First, in the nature of the sting operation itself, and second, in the conduct of Fragozo, the individual who recruited him into the scheme.  However, neither presents sufficient evidence of government inducement to require a jury instruction.

Gutierrez points to three characteristics of the sting operation that he maintains evidence governmental inducement of

---

[5] *Id.*

[6] *Id.* (quoting *Jacobson v. United States*, 503 U.S. 540, 548 (1992)).

[7] *Id.* (quoting *Bradfield*, 113 F.3d at 521).

criminal activity. First, Gutierrez argues that the operation was improper since it resulted in the indictment of persons who were not its original targets. Second, he argues that the sting operation was improperly broad in scope. Finally, Gutierrez maintains that inducement is evident in the fact that the individual targets of the investigation were intentionally kept unaware of the activities of the other targets of the investigation.

Gutierrez's arguments take the entrapment defense beyond its limits. Government involvement in the offense is not the equivalent of government inducement. "Government inducement consists of the creative activity of law enforcement officials in spurring an individual to crime."[8] None of the characteristics of the sting operation identified by Gutierrez establish improper government inducement, or indicate that the Government went beyond the bounds of proper law-enforcement activity. Simply because the chain of events leading to the defendant's arrest originated with the government does not entitle a defendant to an entrapment instruction. "It is proper (i.e., not an 'inducement') for the government to use a 'sting,' at least where it amounts to providing a defendant with an 'opportunity' to commit a crime."[9]

---

[8] *Bradfield*, 113 F.3d at 522.

[9] *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994); *see also Jacobson v. United States*, 503 U.S. 540, 548 (1992) (noting that law enforcement officers may employ "'artifice and

That the operation resulted in the indictment of persons not originally targets of the investigation does not establish improper government conduct. Similarly, that the investigation was broad-ranging, or that the targets of the investigation were unaware of the roles played by other members of the conspiracy, is irrelevant. And Gutierrez cites no authority to support his claim that the Government improperly induces crime by casting a wide net.

Gutierrez relies on *United States v. Gendron*,[10] but it in fact undermines any argument that the sting operation against Gutierrez was improper. *Gendron* set forth seven examples of government activity that might be considered improper, none of which embrace the sting operation at issue here.[11] All of the examples listed in

---

stratagem . . . to catch those engaged in criminal enterprises'" (quoting *Sorrells v. United States*, 287 U.S. 435, 441 (1932))).

[10] 18 F.3d 955.

[11] *Id*. at 961-62 ("Courts have found a basis for sending the entrapment issue to the jury (or finding entrapment established as a matter of law) where government officials: (1) used 'intimidation' and 'threats' against a defendant's family, *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir. 1993); (2) called every day, 'began threatening' the defendant, and were belligerent, *United States v. Groll*, 992 F.2d 755, 759 (7th Cir. 1993); (3) engaged in 'forceful' solicitation and 'dogged insistence until [defendant] capitulated,' [*United States v. Rodriguez*, 858 F.2d 809, 815 (1st Cir. 1988)]; (4) played upon defendant's sympathy for informant's common narcotics experience and withdrawal symptoms, [*Sherman v. United States*, 356 U.S. 369, 373 (1958)]; (5) played upon sentiment of 'one former war buddy ... for another' to get liquor (during prohibition), [*Sorrells v. United States*, 287 U.S. 435, 440-41]; (6) used 'repeated suggestions' which succeeded only when defendant had lost his job and needed money for his family's food and rent, *United States v. Kessee*, 992 F.2d 1001, 1003 (9th Cir. 1993); (7) told defendant that she (the agent) was suicidal

-10-

*Gendron* involve either threatening or harassing conduct or actions designed specifically to take advantage of the defendant's weaknesses, and all involve conduct more egregious than the initiation of a broad sting operation.

Gutierrez also points to a statement from *United States v. Anderton* that entrapment may arise "even though the person implanting the illegal purpose is an ignorant pawn of the government,"[12] arguing that Fragozo's conduct should be attributed to the Government and thereby suffices to establish the requisite government inducement. Even if Fragozo's actions could be attributed to the Government, however, those actions do not amount to government inducement. Gutierrez's sole support for the position that Fragozo improperly induced Gutierrez's participation is Gutierrez's claim that he was frightened of Fragozo because Fragozo, his superior on the police force, had access to the police computer and knew where Gutierrez lived. Yet Gutierrez's asserted fear is unsupported by any suggestion that Fragozo ever threatened him, harassed him, or manipulated his personal weaknesses to convince Gutierrez to join the conspiracy. Nor does Gutierrez point to any evidence of his hesitation to join the scheme or that such hesitation was overcome only by Fragozo's inducements.

---

and in desperate need of money, *United States v. Sullivan*, 919 F.2d 1403, 1419 & n. 21 (10th Cir. 1990).").

[12] 629 F.2d 1044, 1047 (5th Cir. 1980).

-11-

The burden of establishing government inducement is on Gutierrez, and absent more, the mere claim that he was personally frightened of Fragozo is insufficient to establish "a reasonable doubt on the ultimate issue of whether criminal intent originated with the government."[13]  Because Gutierrez did not satisfy his burden of presenting evidence of government inducement, the district court did not err in denying an instruction on the defense of entrapment.

## III

Gutierrez also contends that the district court erred in denying his motions to dismiss for outrageous government misconduct without holding an evidentiary hearing.  The denial of a motion to dismiss an indictment for outrageous government misconduct is reviewed *de novo*,[14] while a district court's decision not to hold an evidentiary hearing before denying a motion to dismiss an indictment is reviewed for an abuse of discretion.[15]

"Government misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of

---

[13] *Bradfield*, 113 F.3d at 521.

[14] *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997).

[15] *See United States v. Linetsky*, 533 F.2d 192, 203 (5th Cir. 1976).

-12-

the Fifth Amendment."[16]  As such, dismissal of an indictment for outrageous government conduct is proper only in "the rarest circumstances."[17]  Accordingly, a defendant claiming outrageous government conduct bears "an extremely high burden of proof," and must demonstrate, in light of the totality of the circumstances, both substantial government involvement in the offense and a passive role by the defendant.[18]  The requirement that the defendant play only a passive role means that "[a] defendant who actively participates in the crime may not avail himself of the defense."[19]

Although on appeal Gutierrez correctly states the law in regard to this claim, he fails to cite any portion of the record in support of his charge of outrageous conduct or point to specific facts tending to establish one of those rare circumstances in which the government's conduct is so outrageous that it implicates principles of fundamental fairness.  Instead, Gutierrez's entire argument on this issue on appeal consists of the conclusory statement that his case presents "a set of circumstances falling within the 'rarest and most outrageous.'"

We do not find error in the district court's refusing to

---

[16] *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) (internal quotation marks omitted).

[17] *Id*.

[18] *Asibor*, 109 F.3d at 1039.

[19] *United States v. Evans*, 941 F.2d 267, 271 (5th Cir. 1991) (internal quotation marks omitted).

conduct an independent hearing on the allegations of government misconduct. Gutierrez's allegations of misconduct, centering on surreptitiously recorded audio tapes of two FBI agents discussing the reverse-sting operation, bore virtually no relevance to the government's case against him. The government's case was grounded not on the testimony or credibility of the agents on the audio tapes – whom neither party called to testify at trial – but was instead based on the video tapes of Gutierrez interacting with Pagan and Fragozo.[20]

Moreover, the district court rightly concluded that Gutierrez "asserted nothing that would imply that [his] participation" in the enterprise "was passive," thereby removing the outrageous government misconduct claim from his reach. In its response to Gutierrez's first misconduct motion, the government explained that he, along with other defendants, had "made their presence known as the hired muscle for someone they suspected to be a narcotics trafficker in what they believed to be his illegal dealings in

---

[20] Gutierrez asserts that, subsequent to his conviction, another FBI agent involved in the reverse-sting, Tonie Jones, pleaded guilty to making false statements in regard to the investigation. Gutierrez argues that Jones's actions during the investigation may constitute outrageous government conduct warranting dismissal of the indictment, and asks that we remand the case to the district court so that it may conduct a hearing on the issue. However, a review of the factual basis for Jones's plea makes clear that the allegations against Jones – who was not a witness in Gutierrez's trial – relate only to his untruthful statements that he and another agent did not assist in taping a conversation with FBI management in June 1998, not to anything that would have related to the investigation into Gutierrez's activities in 2000. Therefore we decline to remand on that basis.

order to provide intimation and further protect the suspected dealer," made "phone calls to each other to report movements of suspected drug traffickers [and] surveill[ed] people believed by them to be drug traffickers," and "protect[ed] what they believed to be drugs, drug proceeds and drug traffickers, including escorting (driving their personal vehicles) load vehicles in order to insure their safe arrival at [the] delivery location[]."

Gutierrez did not refute these allegations, which the government supported with evidence at trial. The testimony showed that during the September 21 transaction Gutierrez agreed to provide security for a drug deal, asked Pagan for a description of the buyer's courier's vehicle so he would be able to spot it upon its arrival into the parking lot, programmed Fragozo's cell phone number into his own cell phone so that he would be able to contact Fragozo as soon as the courier arrived, and waited in the parking lot to notify Fragozo upon the courier's arrival. The district court did not err in concluding that Gutierrez could not prevail on his outrageous government conduct argument since he provided more than "meager assistance" during the operation of the enterprise.[21]

IV

Gutierrez's last point of error has been fluid over the course of this appeal. In his brief Gutierrez argues that the district court abused its discretion in refusing to admit portions of audio

---

[21] *See United States v. Tobias*, 662 F.2d 381, 386 (5th Cir. Unit B 1981).

tape recordings of certain FBI agents talking amongst themselves about the reverse-sting operation, although he failed to cite to the portion of the record in which the district court allegedly denied his request to admit the tapes at trial. At oral argument, Gutierrez did not contend that the district court erred in not admitting these recordings into evidence. Rather, the argument was that it wrongly denied Gutierrez access to the redacted portions of the tapes.

The government's brief urges that it has not been able to locate any proffer by Gutierrez of any portion of the tapes, and at oral argument the prosecutor explained that he did not remember any request by the defendant for the district court to disclose to Gutierrez the redacted portions of the tapes. Despite prompting during oral argument, Gutierrez could not furnish the court with any citation to the record supporting either of his assertions. Our own review of the record has also failed to turn up anything of the sort.[22] Because Gutierrez has shown neither that the district

---

[22] As for Gutierrez's claim that the trial court refused to admit the audio tapes into evidence, only two documents arguably bear on this issue. First, the government filed a motion in limine requesting that the court bar the defense from "releasing [to the jury venire or the jury] the existence and contents of these tapes ... until the relevancy of the tape recordings has been demonstrated by the Defense." The motion did not request a determination on the admissibility of the tapes, but rather simply asked that the court preclude the defense from mentioning the tapes before they demonstrated their admissibility.

Second, in his "Motion for a Protective Order to Prevent the FBI from 'Manipulating the Judicial System' and 'Screwing the System' and for an Evidentiary Hearing to Illicit Evidence of Outrageous Government Conduct," one of a bevy of near-identical

court refused to admit any of the tapes into evidence at trial nor that it refused his request to have access to the redacted portions of the tapes, these issues are not properly before us for review.

V

We AFFIRM Gutierrez's conviction for attempting to aid and abet distribution of and possession with intent to distribute five or more kilograms of cocaine. Gutierrez's motions to supplement the record, to reverse his conviction and remand the case for a new trial, to remand for the purpose of ordering an evidentiary hearing, and to abate the appeal are DENIED. The Government's motion to seal all filings in this appeal is GRANTED pending further order by this court or the district court.

_____

motions filed prior to commencement of his first trial, Gutierrez requested, in addition to an evidentiary hearing, "the right to present [the audio tapes] in evidentiary form so that the jury can see that there were attempts to delete and/or alter documents, and even attempts to train the agents to prepare different sets of documents." The district court denied the "Motion for [a] Protective Order and for [a]n Evidentiary Hearing" but did not express any opinion on the admissibility of the tapes at trial. Gutierrez did not seek at trial to introduce the audio tapes.