# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-40764

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

KAREN MACKEY,

      Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:16-CR-772-1

Before HIGGINBOTHAM, SOUTHWICK, and COSTA, Circuit Judges.

PER CURIAM:*

Karen Mackey was charged with knowingly conspiring to transport aliens within the United States after border patrol agents discovered undocumented aliens in the trunk of her vehicle. She moved to suppress evidence attained during the traffic stop and to dismiss the indictment. The district court denied both motions. Mackey then pled guilty. We AFFIRM.

---

   * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-40764

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of June 6, 2016, Border Patrol Agent Roger Monterojas was inspecting vehicles at a Laredo, Texas border checkpoint. Around 12:57 am, a sedan approached the checkpoint. Monterojas saw that the driver, later identified as Ester Trevino, was a female and that the interior of the sedan was messy. Monterojas believed Trevino to be between the age of 20 and 30 years old. After speaking with Trevino for approximately ten seconds, Monterojas permitted her to proceed.

The next vehicle to approach the checkpoint was also a sedan, and it arrived at approximately 12:58 am. Karen Mackey was later identified as the driver of the second sedan. Monterojas saw that Mackey was a female and that a child was seated in the seat behind her. Monterojas spoke with Mackey for approximately five seconds and then allowed her to continue.

Immediately following Mackey's departure, a third sedan approached the checkpoint at 12:59 am. Monterojas observed that the driver, later identified as Ashley Flores, was a female and around the same age as Trevino and Mackey. He also noticed that the back of Flores's sedan was riding low. Monterojas then asked Flores for permission to open the trunk, which she granted. When Monterojas opened the trunk, he discovered two males. Monterojas immediately alerted other border patrol agents, including Richard Lopez and Ricardo Gomez, that he suspected that the sedans driven by Mackey and Trevino also contained undocumented aliens.

The agents began searching the license-plate reader, which is a computer system that contains photos that are automatically taken of each vehicle that approaches the checkpoint. After the agents evaluated the license plate images of Mackey's and Trevino's sedans, Monterojas told the agents to chase after the vehicles. Around 1:02 am, Lopez left the checkpoint station in pursuit of Mackey and Trevino.

2

No. 17-40764

Lopez speeded north on Highway 83 that passed through the checkpoint. He turned onto a side road and encountered Border Patrol Agent Mariano Castillo. Lopez asked Castillo if he had seen any vehicles passing by on that road. Castillo had not. Lopez informed Castillo that he was looking for Mackey's and Trevino's sedans. Lopez and Castillo determined that the sedans had likely continued north on Highway 83. After eight to ten minutes of driving at high speed on Highway 83, the agents saw Mackey's and Trevino's sedans.

After catching up with the sedans, Castillo then pulled his vehicle behind Trevino's sedan, and Lopez pulled his vehicle behind Mackey's. Lopez activated his emergency lights. Mackey stopped her vehicle. Lopez approached the passenger side and talked with Mackey. Mackey confirmed that she had just passed through the checkpoint and gave Lopez permission to inspect the trunk. Upon opening the trunk, Lopez discovered two individuals. Around this same time, Castillo stopped Trevino's sedan and with her consent, he searched it. Castillo also found two individuals in the trunk.

Sometime during the agents' pursuit of the sedans, Flores had informed Gomez, who had remained at the checkpoint station, that she was following two sedans. Gomez relayed this information over the dispatch radio, but the information was not received by Lopez or Castillo until after they stopped the vehicles.

Mackey, Trevino, and Flores were charged with knowingly conspiring to transport and move within the United States an alien that has come to, entered, or remained in the United States. *See* 8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(1)(A)(v)(I). They were also each charged with three substantive counts. Mackey moved the district court to suppress the evidence that was attained during the traffic stop, contending that the stop was not predicated upon reasonable suspicion.

3

No. 17-40764

The district court referred the motion to a magistrate judge, who conducted an evidentiary hearing. Monterojas, Lopez, Castillo, and Gomez each testified at the hearing. Monterojas testified as to the factors that supported his suspicion that Mackey was also involved in alien smuggling after he had discovered two individuals in Flores's trunk. Monterojas stated that like Flores, Mackey and Trevino were unaccompanied,[1] young female drivers and dressed in a way that was unusual for women proceeding through the checkpoint. Monterojas also believed each of the drivers to be acting in a friendlier manner than the typical late-night driver. Other factors Monterojas mentioned were his observations that the vehicles were all sedans with dirty appearances and had in close sequence arrived at the checkpoint when the agents were changing shifts.

Following the evidentiary hearing, Mackey filed a motion for leave to file her concurrently submitted motion to dismiss the indictment, along with a motion that is no longer relevant. Mackey acknowledged that her motion to dismiss was untimely but contended she should be granted leave to file because the factual basis for the dismissal only arose during the suppression hearing. Mackey argued that the agents' testimony at the suppression hearing revealed that the indictment should be dismissed because the agents violated her right to be free from gender profiling under the Fifth Amendment's Due Process Clause and improperly restrained her First Amendment right to freedom of expression.

The magistrate judge recommended that the district court deny all of Mackey's motions. After considering Mackey's objections to the recommendations, the district court denied Mackey's motions. Mackey later

---

[1] Monterojas testified that he saw that Mackey had a child in the back seat. Mackey at least was unaccompanied by any other adult.

No. 17-40764

entered a guilty plea for knowingly conspiring to transport undocumented aliens within the United States. Her plea was conditioned on the right to have appellate review of the district court's denial of her motions to suppress and to dismiss the indictment. The district court accepted the plea and sentenced Mackey to 24 months of imprisonment and three years of supervised release.

## DISCUSSION

### I.    *Motion to Suppress*

In considering the district court's denial of Mackey's motion to suppress, we view the evidence in the light most favorable to the Government, who prevailed on those rulings. *United States v. Lopez-Moreno*, 420 F.3d 420, 429 (5th Cir. 2005). We review the district court's findings of fact for clear error; that court's determination that the facts provided reasonable suspicion and its conclusions of law are reviewed *de novo*. *Id.* at 429–30. Not relevant in our review are the "officer's subjective intentions" because reasonable suspicion and probable cause are measured under an objective test. *Id.* at 432.

Individuals are protected by the Fourth Amendment from "unreasonable searches and seizures." U.S. CONST. amend. IV. Traffic stops constitute seizures for Fourth Amendment purposes. *Lopez-Moreno*, 420 F.3d at 430. "[A]n officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Id.* In reviewing whether there was reasonable suspicion, "we ask whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)).

Reasonable suspicion for an investigatory vehicular stop "cannot result from the simple fact that two cars are traveling on a roadway . . . one in front

of the other, unless there are other 'connecting factors' to establish that their simultaneous travel could rationally be considered suspicious." *United States v. Rangel-Portillo*, 586 F.3d 376, 382 (5th Cir. 2009) (citation omitted).  Here, the factors identified by the district court that made all three drivers sufficiently suspicious are these out-of-the-ordinary connecting details: "(1) they arrived at the checkpoint nearly contemporaneously to each other, (2) no other vehicles arrived at the checkpoint between them, and (3) all three of them drove sedans."  The district court explicitly did not consider that all three drivers were women, saying these other details were sufficient for the needed suspicion.  Mackey contends that this holding was error because, contrary to the district court's findings, the agents relied on her gender as the sole justification for stopping her vehicle.  She argues that such reliance on gender is an insufficient basis to justify an investigatory vehicular stop.

Mackey relies on a 1975 Supreme Court opinion to support that gender cannot be used as the sole factor supporting reasonable suspicion.  *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).  The Court in *Brignoni-Ponce* held that the apparent Mexican ancestry of a vehicle's occupants, standing alone, cannot justify stopping a vehicle in the area surrounding the United States-Mexico border.  *Id.* at 885–86.  Mackey contends that, like Mexican ancestry, the gender of a vehicle's occupants is an insufficient basis to justify stopping a vehicle.  Mackey's argument does not fairly take into account how the district court's findings supporting denial of suppression smoothly fit with what the Supreme Court held.  Near the border with Mexico, the Supreme Court determined, the apparent Mexican ancestry of someone was "a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." *Id.* at 887.  The Court specifically authorized agents to consider "the usual patterns of traffic on the particular road," a "driver's behavior," and "[a]spects of the vehicle itself." *Id.* at 884–85.

No. 17-40764

The district court's finding that the agents did not stop her solely because she is a woman is supported by the fact that neither Mackey nor the first driver was stopped for suspected alien smuggling when the agents first encountered the female drivers.  It was only after the discovery of suspected aliens in the third vehicle's trunk that Monterojas became suspicious that Mackey also was involved in illegal activity.  Monterojas testified that he believed Mackey's vehicle was connected to the third one because it was unusual for that time of night to have three sedans that were driven by unaccompanied, similarly aged women to approach the checkpoint one after the other.  The three sedans were unusual to Monterojas because the usual traffic pattern between 12:50 and 1:00 am is commercial trucks and 18-wheelers that work on the oil rigs in the surrounding area.  Traffic patterns and the kinds of vehicles are relevant according to *Brignoni-Ponce*.  *Id.*

Agent Lopez similarly testified that based on his experience at the checkpoint, at that time of night, the usual traffic is "oilfield workers or tractor-trailers," not sedans.  According to Lopez, when agents at the checkpoint encounter numerous sedans late at night, it is usually because a nearby sporting event had taken place.  The agents were unaware of any such event on the night that Mackey's vehicle approached the checkpoint.  Indeed, Monterojas testified that there had been "regular traffic" coming through the checkpoint on that night, which consisted of trucks and 18-wheelers.

Lastly, Monterojas found the timing of Mackey's arrival also to be suspicious because she and the other drivers approached the checkpoint when the agents were about to change shifts.  Monterojas testified that the smugglers in the surrounding area know when the agents change shifts and wait for these times to "make their move" because agents tend to get distracted when they are passing information over to the next agent.

7

No. 17-40764

In summary, whether agents "developed a reasonable suspicion must be made based on the totality of the circumstances and the collective knowledge and experience of the" agents. *United States v. Estrada*, 459 F.3d 627, 631–32 (5th Cir. 2006). Viewing the evidence in the light most favorable to the Government and considering the totality of the circumstances, the agents' discovery of undocumented aliens in Flores's trunk, coupled with the agents' informed belief that Mackey's sedan was traveling with Flores's, provided the agents with reasonable suspicion to conduct an investigatory stop of Mackey's vehicle. *See, e.g., United States v. Bender*, 588 F.2d 200, 202 (5th Cir. 1979).

We need not consider the Government's alternative argument that suppression of the evidence is unwarranted under the inevitable discovery doctrine.

## II.    *Motions for Leave and to Dismiss the Indictment*

The district court denied Mackey's motion for leave to file a motion to dismiss because she failed to show good cause. In the alternative, the court determined that the offered motion to dismiss, based on gender profiling and freedom of expression claims, was meritless. We examine only the second ruling. We give *de novo* review to the denial of a motion to dismiss an indictment. *United States v. Ollison*, 555 F.3d 152, 160 (5th Cir. 2009).

### A. *Gender Profiling*

"Government misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment." *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)). "As such, dismissal of an indictment for outrageous government conduct is proper only in 'the rarest circumstances.'"

No. 17-40764

*United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003) (quoting *Johnson*, 68 F.3d at 902).

Mackey contends that the district court erred in not dismissing the indictment because the agents' testimony at the suppression hearing established that the agents violated her due process rights by considering her gender as a basis for justifying her detention. She argues that such "gender profiling" constituted behavior that necessitates dismissal of the indictment with prejudice.

We have already discussed that the record does not support that the agents stopped Mackey solely because she is a woman. Though Mackey's gender was a factor that connected her to Flores, this factor was only relevant in light of the agents' knowledge pertaining to the checkpoint's usual traffic. The agents' consideration of Mackey's gender in this context was not error, much less "so 'shocking to the universal sense of justice' . . . that the government should have been deprived for all time of the opportunity to prosecute" Mackey. *United States v. Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009) (citation omitted).

### B. Freedom of Expression

Mackey also argues that comments by Monterojas that he believed all three women were not dressed in the typical "dress code" is a violation of her freedom of expression. A person's "choice to wear clothing as a symbol of an opinion or cause" can be First Amendment-protected expression "if the message is likely to be understood by those intended to view it." *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 441 (5th Cir. 2001). Though not every choice of clothing is afforded First Amendment protection, "certain choices . . . may have sufficient communicative content to qualify as First Amendment activity." *Id.* at 441 n.3.

On the night she was stopped, Mackey was wearing a solid gray tank top, solid black pants, and sandals. Her clothing displayed no words or illustrations. Mackey contends that her attire constituted protected expression and argues that the agents impermissibly targeted her because she was not dressed in clothing that was the typical "dress code" for women passing through the checkpoint.

First, nothing in the record supports that Mackey's choice of clothing was "endowed with sufficient levels of intentional expression to elicit First Amendment shelter." *Id.* at 440. Moving beyond that defect in the claim, we examine the decision Mackey cites in which we held that "placing an NRA sticker in one's vehicle is certainly legal and constitutes expression which is protected by the First Amendment." *Estep v. Dallas Cnty.*, 310 F.3d 353, 358 (5th Cir. 2002). Our conclusion that an officer could not consider such an expressive sticker in formulating reasonable suspicion to make a stop is irrelevant here. *See id.* at 359. Indeed, we declined to decide "whether the presence of an NRA sticker could ever contribute to a 'reasonable suspicion' of danger calculus." *Id.* at 358–59. Had three vehicles in a row at a border checkpoint all had identical expressive stickers, nothing in *Estep* clearly prohibits officers from considering that fact to be evidence of a connection among them.

AFFIRMED.