# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 97-40875
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SERGIO CAVAZOS, a/k/a EL NEGRO,
GUILLERMO GARZA, a/k/a BILLY, JORGE
RAMOS-PESCADO, a/k/a PAYO, and MIGUEL
CISNEROS, Jr.

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas
(L-97-CR-70-6)
_____

November 6, 1998

Before WISDOM, WIENER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Defendants-Appellants Sergio Cavazos, Guillermo Garza, Jorge Ramos-Pescado ("Ramos"), and Miguel Cisneros, Jr. appeal their convictions for conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a) and 846. Garza additionally appeals his conviction for aiding and abetting in the possession of marijuana in violation of 21 U.S.C. § 841(b). For the reasons set forth below, we affirm the convictions.

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

FACTS AND PROCEEDINGS

In January 1997, Drug Enforcement Agent Armando Ramirez, Jr., acting in an undercover capacity, met with Garza in Laredo, Texas to negotiate the purchase of a large quantity of marijuana. The meeting was arranged by a confidential informant, Jose Louis Perez. Garza, whom Perez introduced to Agent Ramirez as "Billy," told Ramirez that he had 300 to 325 pounds of marijuana for sale and that Ramirez would be pleased with the quality of the drugs. Garza and Ramirez met again the next day to discuss the purchase of the original quantity of marijuana as well as an additional 400 pounds that Garza expected to receive shortly. Garza mentioned only one associate by name during these discussions, referring to him as "Jorge."

Although on the following day Garza informed Agent Ramirez that he was having difficulty obtaining the additional 400 pounds of marijuana, the two men arranged for Ramirez to provide Garza with an Oldsmobile Delta 88 to transport the drugs. Ramirez delivered the Delta 88 to Garza, making the exchange in the parking lot of an HEB grocery store. Garza, however, returned the vehicle to Ramirez, claiming that while driving it an associate had been pulled over for an expired inspection sticker.

Over the next few days, Garza and Ramirez had several discussions regarding both the price per pound — which Garza raised from the initial agreed price of $200 per pound to $210 per pound — and the quantity of marijuana that Garza was to provide.

Garza continued to report difficulties in obtaining the additional marijuana, although at one point he informed Garza that the drugs were at a ranch about 25 miles outside Laredo. Later, Ramirez was informed by Garza that his boss' brother wanted Ramirez to view the marijuana at a house outside the city limits. Ramirez refused out of safety concerns.

Throughout these conversations, Ramirez stressed that he needed to know the exact amount of the marijuana Garza would be able to provide so that he would know how much money to bring. After a few days had passed, Ramirez told Garza that the people who had invested their money were very anxious because of the delay and that he (Ramirez) would have to travel to Dallas to meet with them. Garza attempted to dissuade Ramirez from leaving town, stressing that he would be ready to make the exchange very soon.

Finally, Garza reported that he had about 600 pounds of marijuana and that he wanted to deliver it to Garza in two loads — 230 pounds first and the rest later. Garza repeated that Ramirez would be pleased with the quality of the marijuana. Ramirez told Garza that it was too dark to complete the transaction that night, but that they could set it up the next day. Garza asked Ramirez to call him around noon to work out the arrangements.

Ramirez phoned Garza at the appointed time and suggested that they meet at the HEB parking lot and then go to the apartment of a cousin of Ramirez in Laredo to unload the drugs. Garza stated that he did not want to meet at the HEB because "he had problems there in the past," but agreed to meet at a Maverick Market instead, some

3

time between 12:00 p.m. and 12:30 p.m. Garza stated that he wanted to meet around noon because traffic would be heavy and could cause problems for any narcotics officers in the area.

At approximately 12:30 p.m., the officers began to observe Cavazos's residence at 2117 Camp Street, an address to which the officers had previously followed Garza. A Plymouth that Garza had driven to the initial meeting with Ramirez was parked on the lawn, and a red pickup truck was parked across the street. Shortly after the officers began to monitor the residence, a two-door Nissan and a white pickup truck arrived. After approximately half an hour, the Plymouth and the two pickups pulled away from 2117 Camp, stopping for 10 or 15 seconds at one point so that the occupants could speak to each other. The red pickup then split off from the other two vehicles, but all three eventually rendezvoused in the vicinity Maverick Market and parked.

Officers next observed Cavazos get out of the red pickup from the passenger's side, then walk over and meet for a few minutes with Garza, who was driving the Plymouth. Officers later identified Cisneros as the driver and owner of the red pickup and Ramos as an additional passenger in that vehicle. After speaking with Garza, Cavazos returned to the red pickup, which Cisneros then drove a short distance to help jump start an unidentified vehicle. At this time, the Nissan, which had left 2117 Camp a few minutes after the other three vehicles, arrived and was parked next to Garza's Plymouth. Juan Palacios, a co-defendant who pleaded guilty prior to trial, was driving the Nissan. Palacios got out of the

**4**

vehicle and spoke with Garza briefly.

At approximately 1:30 p.m., Ramirez arrived at Maverick Market in his own vehicle. As he pulled into the parking lot, Garza, Cavazos, and Palacios were standing together talking in front of the Plymouth. When he spotted Ramirez, Cavazos ran back to the red pickup. That vehicle, followed by the white pickup, then drove to a road directly behind Maverick Market. The two pickups stopped briefly while their occupants conversed, then returned to the front of the market.

Meanwhile, Ramirez was approached by Garza and was told that everything was ready. Garza said that he would follow Ramirez to make the exchange. Garza also informed Ramirez that some of the marijuana was in the Plymouth, which Palacios would be driving, but that most of it was in the trunk of the Nissan. Ramirez drove out of the Maverick Market parking lot in his own vehicle, followed by the Plymouth driven by Palacios and by the red truck as well. Garza remained behind with the Nissan.

Ramirez and Palacios proceeded to the site of the putative exchange, but the red pickup broke off quickly, turning into a nearby Taco Bell parking lot where a police surveillance unit was parked. The white pickup first joined the red pickup and then drove back to the Maverick Market to link up with Garza. Fearing that they would be discovered, the surveillance officers decided to arrest all those remaining in the vicinity of the Maverick Market. Because the officers were forced to make this move before they had anticipated, they were unable to arrest the occupants of the white

**5**

pickup.

The officers recovered a hand-held radio and 207.2 pounds of marijuana from the back seat and the trunk of the Nissan and an additional 38 pounds of marijuana from the Plymouth. The officers found no weapons, radios, cellular phones, or marijuana in the red pickup. When interviewed after his arrest, Ramos began to tremble visibly and told the arresting officer in Spanish, "I know I did wrong."

Cavazos, Garza, Ramos, and Cisneros were convicted of conspiracy to possess with intent to distribute marijuana. Garza was additionally convicted of aiding and abetting in the possession of marijuana.

II.

ANALYSIS

1.   Entrapment

Although the district court instructed the jury on the defense of entrapment, Garza asserts that the district court erred in failing to rule that he was entrapped as a matter of law because the government allegedly failed to rebut his entrapment evidence.

The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with the government agents.[2]   Thus the threshold question is whether the

_____

[2]United States v. Bradfield, 113 F.3d 515, 521 (5th Cir. 1997);  United States v. Pruneda-Gonzalez, 953 F.2d 190, 197 (5th Cir. 1992) (citing United States v. Nations, 764 F.2d 1073, 1079 (5th Cir. 1985)).

6

defendant was predisposed to commit the offense.[3]  To assert an entrapment defense successfully, the defendant must first make out a prima facie case that the government's conduct created a substantial risk that an offense would be committed by a person other than one ready to commit it.[4]  This requires the defendant to show both (1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense.[5]

Predisposition focuses on whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the offense.[6]  Specifically, the question is whether the defendant intended, was predisposed, or was willing to commit the offense before first being approached by government agents.[7]  Government inducement consists of the creative activity of law enforcement officials in spurring an individual to crime.[8]  Evidence that government agents

---

[3]United States v. Ivey, 949 F.2d 759, 768 (5th Cir. 1991).

[4]United States v. Johnson, 872 F.2d 612, 620 (5th Cir. 1989); United States v. Hudson, 982 F.2d 160, 162 (5th Cir. 1993).

[5]Pruneda-Gonzalez, 953 F.2d at 197;  United States v. Andrew, 666 F.2d 915, 922 (5th Cir. 1982);  United States v. Leon, 679 F.2d 534, 538 (5th Cir. 1982);  United States v. Fischel, 686 F.2d 1082, 1085 (5th Cir. 1982).

[6]Mathews, 485 U.S. 58, 63 (1988) (citations omitted).

[7]Johnson, 872 F.2d at 620-21 (citing United States v. Yater, 756 F.2d 1058 (5th Cir. 1985).

[8]Fischel, 686 F.2d at 1085.

merely afforded the defendant an opportunity or the facilities for the commission of the crime is insufficient to warrant the entrapment instruction.[9]  To constitute inducement, the government's conduct must go beyond mere solicitation, it "must include an element of persuasion or mild coercion, such as misrepresentations, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy or friendship."[10]

If the defendant makes a prima facie showing of both elements — lack of predisposition and government activity rising to the level of true inducement — he is entitled to a jury instruction on the issue of entrapment.[11]  At this juncture the burden shifts to the government to prove beyond a reasonable doubt that the defendant was disposed to commit the offense prior to first being approached by government agents.[12]  To declare entrapment as a matter of law, however, the court must determine that no reasonable jury could find that the defendant was predisposed to commit the offense.[13]

Garza argues that, because the government's confidential informant Perez did not testify at trial, Garza's testimony

---

[9]Mathews, 485 U.S. at 66.

[10]United States v. Jackson, 700 F.2d 181, 191 (5th Cir. 1983).

[11]Mathews, 485 U.S. at 66; Nations, 764 F.2d at 1080 (holding defendant must show evidence that provides, at the least, a basis for a reasonable doubt on the ultimate issue of whether criminal intent originated with the government to obtain entrapment instruction).

[12]Bradfield, 113 F.3d at 521.

[13]Nations, 764 F.2d at 1077.

regarding his lack of predisposition and government inducement is uncontradicted; that as such the district court erred in failing to rule he was entrapped as a matter of law.  We disagree.

As an initial matter, Garza presented insufficient evidence to support a finding that the government agents induced him to commit the charged offense.  Garza testified that he was involved in the marijuana transaction, but explained that Perez initiated the idea of getting involved in the scheme.  Garza testified that Perez first suggested that they get involved in criminal activity in September 1996, but that he (Garza) resisted until around mid-January 1997, after he had been evicted from his apartment and his daughter, who had been living with him, had gone back to live with her mother.  When asked directly why he agreed to get involved in the marijuana deal, he stated:  "Well, like I said, I was down and out and if you've ever been evicted and —— I mean, had the opportunity to be out there, no place to stay, it's not a real good feeling."  He added that Perez's offer was like throwing a "drowning man a rope" and that the deal would help him out of his "financial rut."

Garza offered no testimony that Perez threatened, coerced, or harassed him into participating in the illegal drug transaction.[14]

---

[14]Cf. Jacobson v. United States, 503 U.S. 540, (1992) (holding defendant was entrapped into ordering child pornography when defendant was target of 26 months of repeated mailings designed to convince him that "he had or should have the right to engaged in the very behavior proscribed by law."); United States v. Sandoval, 20 F.3d 134, 137 (5th Cir. 1994) (holding defendant was entrapped into participating in bribery scheme when IRS agent rejected defendant's original request for reward in return for information, made persistent requests for personal benefit, and repeatedly

Garza testified simply that over a period of a few months Perez sporadically asked him whether he wanted to make money by trafficking in narcotics and that, after initially resisting, Garza agreed. "Inducement," however, represents "more than mere suggestion, solicitation, or initiation of contact . . . ."[15] That Garza was initially hesitant to engage in the illegal conduct does not alter the analysis.[16] As Garza did not present sufficient evidence to warrant an entrapment instruction — which he nevertheless received and which the jury rejected — he obviously failed to establish that he was entrapped as a matter of law.

Even assuming arguendo that Garza presented sufficient evidence to raise an issue of inducement, the entirety of the evidence is not "so overwhelming that it [is] patently clear or obvious that [he was] entrapped as a matter of law."[17] Garza relies entirely on his own testimony to prove his lack of disposition. Generally, "a defendant's testimony cannot by itself establish entrapment as a matter of law as, absent unusual circumstances, the

---

emphasized defendant's tax and penalty exposure "to pla[y] on [defendant's] weakness").

[15]United States v. Hill, 626 F.2d 1301, 1304 (5th Cir. 1980); see also United States v. Johnson, 32 F.3d 304, 308 (7th Cir. 1994) ("Mere solicitation by a government agent is insufficient to establish entrapment.") (citing Gonzalez v. United States, 474 U.S. 831 (1985)) (additional citations omitted); United States v. McKinley, 70 F.3d 1307, 1312 (D.C. Cir. 1995) ("[M]ere solicitation by the Government, to which the defendant acquiesced with reasonable readiness, does not evince inducement.") (quotation and citation omitted).

[16]Fischel, 686 F.2d at 1086.

[17]United States v. Grubbs, 776 F.2d 1281, 1285 (5th Cir. 1985).

jury is entitled to disbelieve that testimony."[18]  Thus, we will not set aside a jury's conviction on entrapment grounds if there is sufficient evidence to support the jury's finding that Garza was predisposed to commit this crime.[19]

"Many factors may indicate a defendant's predisposition, including a showing of defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation."[20]  Here, Garza testified that he got involved in the transaction because he had "nothing to loose" and he wanted to get out of his "financial rut."  There was, moreover, an abundance of testimony on which the jury could conclude that Garza was experienced in narcotics trafficking.  Garza claimed that he would, and then did, procure a considerable quantity of marijuana.[21]  He refused to meet Agent Ramirez at the HEB because he had had problems there in the past. He stated that he wanted to meet Agent Ramirez around noon because traffic at that time would cause difficulties for law enforcement.

Finally, Garza demonstrated his enthusiasm for the deal through his multiple conversations concerning the details of the

---

[18]United States v. Mora, 994 F.2d 1129, 1137 (5th Cir. 1993) (citing Masciale v. United States, 356 U.S. 386, 389 (1958)).

[19]Id.

[20]United States v. Chavez, 119 F.3d 342, 346 (5th Cir.), cert. denied, __ U.S. __, 118 S. Ct. 615 (1997) (quotation and citation omitted).

[21]Mora, 994 F.2d at 1137.

transaction and his entreaties to Ramirez not to leave town.[22]  In short, even assuming Garza "did not seek out the [illegal transaction], ‹an opportunity was provided and [Garza] jumped in with both feet' . . . ."[23]  In light of this evidence, a reasonable jury could find that Garza was predisposed to commit the crimes with which he was charged.

2.    Sufficiency of the Evidence

In reviewing challenges to the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and decide whether a rational jury could have found that the government proved all of the elements of the offense beyond a reasonable doubt.[24]  We resolve all inferences and credibility determinations in favor of the jury's verdict.[25]

To sustain a conviction for conspiracy to possess with the intent to distribute marijuana, the government must prove beyond a reasonable doubt that (1) a conspiracy existed, (2) the defendant knew of the conspiracy, and (3) the defendant voluntarily participated in the conspiracy.[26]  The government need not prove the elements by direct evidence alone; their existence may be inferred

---

[22]United States v. Arditti, 955 F.2d 331, 343 (5th Cir. 1992) (willing and active participation with no overwhelming evidence of serious resistance sufficient to find predisposition).

[23]Id. (quoting Johnson, 872 F.2d at 621).

[24]United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992) (citing Glasser v. United States, 315 U.S. 60, 80 (1942)).

[25]United States v. Castro, 15 F.3d 417, 419 (5th Cir. 1994).

[26]United States v. Sacerio, 952 F.2d 860, 863 (5th Cir. 1992).

from the "development and collocation of circumstances."[27]  An agreement may be inferred from a "concert of action."[28]

We will not, however, lightly infer a defendant's knowledge of and participation in a conspiracy.[29]  When the government attempts to prove the existence of a conspiracy by circumstantial evidence alone, each link of the inferential chain must be clearly proven."[30] A defendant's mere presence at the crime scene or close association with the conspirators, standing alone, does not support an inference of participation in the conspiracy.[31] Similarly, evidence that a person's behavior coincided with that characteristic of a lookout cannot alone show knowledge of a conspiracy.[32]

Cavazos, Ramos, and Cisneros assert that the evidence is insufficient to support their convictions, insisting that the evidence does nothing more than establish their presence at the crime scene and association with others who were participating in

---

[27]Maltos, 985 F.2d at 746 (quoting United States v. Vergara, 687 F.2d 57, 61 (5th Cir. 1982)).

[28]United States v. Sanchez-Sotelo, 8 F.3d 202, 208 (5th Cir. 1993) (quotation and citation omitted).

[29]Maltos, 985 F.2d at 747 (Jackson, 700 F.2d at 185).

[30]United States v. Ross, 58 F.3d 154, 160 (5th Cir. 1994).

[31]Maltos, 985 F.2d at 746;  United States v. DeSimone, 660 F.2d 532, 537 (5th Cir. 1981); Sacerio, 952 F.2d at 863;  United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1988); Jackson, 700 at 185-86.

[32]Dean, 59 F.3d 1479,1486 (5th Cir. 1995) (citing United States v. Menesses, 962 F.2d 420, 427 (5th Cir. 1992)).

**13**

the illegal activity.[33]   The three defendants place particular emphasis on the facts that none of them was involved in the negotiations and arrangements preceding the drug transaction and that the officers discovered no drugs, weapons, or communication devices in the red pickup — the vehicle of which they were occupants — at the time of their arrest.

Our review of the record leads us to conclude that the evidence adduced at trial and all reasonable inferences therefrom are sufficient, when viewed in the light most favorable to the verdict, to show beyond a reasonable doubt that Cavazos, Ramos, and Cisneros knew of and participated in the conspiracy.  First, all three defendants waited at Cavazos's residence for approximately 30 minutes immediately before Garza and Palacios drove the marijuana to the planned place of exchange.[34]  Second, they drove in tandem with Garza and the white pickup to the Maverick Market — the place of the proposed drug transaction.  Finally, after arriving at the Maverick Market, they engaged in a series of highly coordinated movements centered on the Plymouth, the Nissan, and Agent Ramirez, the putative buyer.[35]

---

[33]The defendants do not assert that no conspiracy existed, only that they did not know of, or voluntarily participate in, the conspiracy.

[34]Dean, 59 F.3d at 1484 (defendant seen at principal's house before drug transaction); Sanchez-Sotelo, 8 F.3d at 209 (defendant met with principals in motel prior to drug transaction).

[35]See Sanchez-Sotelo, 8 F.3d at 209 (evidence sufficient for conspiracy conviction when defendant met with co-conspirators prior to drug transaction, followed principal in his truck to place of exchange, and waited nearby until exchange took place).

With regard to Cavazos, in addition to the above, the co-conspirators met at <u>his</u> house just prior to the proposed drug transaction;[36] he met with Garza and Palacios while they waited for Ramirez in the Maverick Market parking lot;[37] and he ran back to his car when Ramirez arrived.[38]

Concerning Ramos, the one name Garza mentioned during his negotiations with Agent Ramirez was "Jorge," Ramos's first name. More importantly, when he was arrested, Ramos began to tremble visibly[39] and stated "I know I did wrong." Although Ramos quibbles with the meaning of the admission, when viewed in the light most favorable to the verdict, the statement could reasonably be interpreted as an admission of his participation in the narcotics conspiracy.[40] Ramos correctly asserts that "an accused may not be convicted on his own uncorroborated confession."[41] The evidence necessary to corroborate a confession, however, "need not [alone]

---

[36]<u>Cf.</u> <u>United States v. Valdiosera-Godinez</u>, 932 F.2d 1093, 1096 (5th Cir. 1991) ("Had [defendant] not been privy to the agreement and part of it, the other two men certainly would not have allowed him to stick around.")

[37]<u>Dean</u>, 59 F.3d at 1484 (defendant met with principal during transaction); <u>Sanchez-Sotelo</u>, 8 F.3d at 209 (same).

[38]<u>Cf.</u> <u>id.</u> (defendant fled scene when gunfire erupted).

[39]<u>United States v. Musa</u>, 45 F.3d 922, 926 (5th Cir. 1995) (relying on defendant's erratic, nervous behavior as evidence of guilty knowledge).

[40]<u>See</u> <u>Dean</u>, 59 F.3d at 1487 (stating that, when viewed in light most favorable to verdict, principal's reference to "my people" included defendant).

[41]<u>United States v. Ybarra</u>, 70 F.3d 362, 365 (1995) (quoting <u>Smith v. United States</u>, 348 U.S. 147, 152 (1954)), <u>cert. denied</u>, 517 U.S. 1174 (1996).

prove the defendant's guilt beyond a reasonable doubt, nor even by a preponderance . . . ."[42] "[E]xtrinsic proof [is] sufficient which merely fortifies the truth of the confession, without independently establishing the crime charged."[43] Ramos's admission is sufficiently corroborated by the above recited evidence which tends to show that he was serving as a lookout for the illegal transaction.

Finally, Cisneros was the owner and the driver of the red pickup. Significantly, he drove the pickup when it twice rendezvoused with the white truck. It is highly unlikely that the other defendants would allow Cisneros to "hang out" with them at Cavazos's residence and then drive the vehicle central to their lookout duties were he unaware of and not a participant in the agreement.[44]

In sum, although a defendant's mere presence at the scene of illegal activity is not sufficient to support the inference that the defendants participated in the conspiracy, "presence is still a significant factor to be considered within the context under which it occurs."[45] The defendants' highly coordinated movements, Cavazos's meetings with the Garza and Palacios both immediately

---

[42]Id. (quoting United States v. Garth, 773 F.2d 1469, 1479 (5th Cir. 1985))

[43]Id. (quoting Garth, 773 F.2d at 1479).

[44]Cf. Valdiosera-Godinez, 932 F.2d at 1096 ("Had [defendant] not been privy to the agreement and part of it, the other two men certainly would not have allowed him to stick around.")

[45]United States v. Quirez-Hernandez, 48 F.3d 858, 866 (5th Cir. 1995).

before and during the proposed transaction, and Ramos's inculpatory statement when viewed cumulatively and in light most favorable to the verdict sufficiently support the jury's determination that the defendants knew of and participated in the conspiracy to possess with intent to distribute marijuana.

CONCLUSION

For the foregoing reasons, the convictions of Sergio Cavazos, Guillermo Garza, Jorge Ramos-Pescado, and Miguel Cisneros are AFFIRMED.