# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-31064

United States Court of Appeals
Fifth Circuit

**FILED**

November 13, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ARTHUR GILMORE, JR.,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:10-CR-200-2

Before JOLLY, HIGGINBOTHAM, and OWEN, Circuit Judges.

PER CURIAM:[*]

In May 2013, a jury found Arthur Gilmore, Jr., a former Monroe, Louisiana city councilman, guilty of violating the Racketeering Influence and Corrupt Organizations Act ("RICO"). In this direct appeal, we are asked two questions: (1) was Gilmore entitled to a jury instruction on entrapment, and (2) was there sufficient evidence to support his conviction under RICO?

We answer "no" to the first, "yes" to the second, and AFFIRM Gilmore's conviction.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-31604

## I.

In the mid-2000s, Arthur Gilmore, Jr., was one of five members of the Monroe, Louisiana city council, the city's legislative body.[1]  In that capacity, he met on occasion with members of the city's business community, including, as relevant for this case, Eddie Hakim, a local real estate developer.[2]  Hakim knew Gilmore by reputation as a councilman in 2004 or 2005, but did not speak with him directly until late 2006 or early 2007, when he met him through a mutual acquaintance, a civil engineer who did some development work for Hakim.[3]

Hakim testified at trial that, over the course of 2007, he regularly gave Gilmore cash contributions and in-kind donations, including free or reduced price printing jobs and free meals and stays in restaurants and hotels that he owned, in exchange for favorable assistance with certain zoning variances that he sought.[4]  In late 2007 or early 2008, Hakim, for reasons not entirely clear from the record,[5] went to the Louisiana State Police, who referred him to the FBI.[6]  The FBI recruited Hakim as an informant.  In doing so, it did not conduct a background check on him or ask for any evidence to corroborate his claims that he had been bribing public officials.[7]

---

[1] R. 6345-46.

[2] R. 6370-71.

[3] R. 6375-76.

[4] R. 6375-78, 6387-88.  Hakim also testified that he gave Maroney, the civil engineer, money to be delivered to Gilmore, and that he watched Maroney give Gilmore that money. *See* R. 6378-80.

[5] Hakim testified at trial that he went to law enforcement authorities because the "pay to play thing" with Gilmore "bothered the heck out of [him]." R. 6382.  Taking all inferences in favor of Gilmore, the trial record could support a less altruistic conclusion.  There is some evidence that Hakim was a political opponent of the Monroe mayor, and that he went to the FBI at least in part because he felt pressured to sell property to Gilmore at a below-market price.  *See* R. 6365, 6403.

[6] R. 6382.

[7] *See* R. 6359-60 ("Q: Okay.  Now, when Mr. Hakim came to you, he also told you he had been bribing the Mayor, didn't he? A [FBI Agent]: Yes, sir.  Q: He didn't bring any

No. 13-31604

Pursuant to the FBI's directions, Hakim recorded his contacts with Gilmore,[8] two of which formed the basis for Gilmore's conviction.

## A.

On March 26, 2008, Gilmore called Hakim, apparently after a gap in their acquaintance.[9]   The conversation focused on Gilmore's upcoming reelection campaign; Hakim asked if the campaign was "taken care of," and Gilmore said it was.[10]   Gilmore also said that instead of using Hakim's company for printing, he had found a new vendor.  Hakim asked why.

HAKIM: Well, why didn't you call me?  You know how it works.

GILMORE: Yeah, I was saving you for something bigger.

HAKIM: Saving me for something bigger.

GILMORE: Yeah, that's right.

HAKIM: Yeah, we've always worked it out.  We still can.

GILMORE: Yeah, okay.[11]

Hakim then told Gilmore that "we need to meet cause I'm gonna be needing yah," referred to two development projects he was working on, and they agreed to meet for lunch the next day.[12]

---

evidence with him or anything of that nature, he just said, 'I've been paying bribes to the Mayor'? A: I believe so.  That's correct, sir."); R. 6361 ("Q: Well let me ask you this.  When somebody comes in your room and says, 'Hey, I've been bribing the mayor,' you just send them out to try to get evidence on the mayor, or do you background them a little bit? A: It depends on the circumstances.  Q: Okay.  Well, let's ask about these circumstances.  Did you background Mr. Hakim at all?  A: I really don't remember, sir."); R. 6464-65 ("Okay.  Did it ever occur to you to ask him, 'Mr. Hakim, you're coming in here, you're saying this stuff about the Mayor, you're saying this stuff about Mr. Gilmore, you've got these video records, you've got these audio records; show us something you've recorded'? A: No, sir, we didn't.").

[8] *See* R. 6403.

[9] Ex. 19T at 1 ("Hakim: Okay, uh, long time no hear from you.").

[10] *Id.*

[11] *Id.* at 2.

[12] *Id.* at 3.

3

No. 13-31604

At lunch, Gilmore was the first to bring up city business, asking Hakim about how the developer's zoning application with the Board of Adjustment was going.[13]  Gilmore apparently had no direct involvement in this specific project.[14]  Hakim then moved the conversation to some other of his developments, and after laying out his plans, asked for help:

> HAKIM: And then my crew . . . start[s] the roads.  And that's what I'm gonna need you for over there, for the roads and the fence and . . .
>
> GILMORE: Okay.
>
> HAKIM: So you said you were saving me for something big.  I'm saving you for something big.  I need you to push it through City Hall.
>
> GILMORE: What kind of road, uh . . .
>
> HAKIM: Uh, it's gonna be just like the one we had in Maison Orleans.
>
> GILMORE: Okay.[15]

The two men discussed the proposed development in more general terms, and then turned back to their meal.  During the soup course, Hakim turned the conversation to Gilmore's recently concluded reelection campaign.  Gilmore noted that he had a relatively easy win, and Hakim emphasized that he had supported him during his election efforts.  The conversation then moved back to Hakim's development project:

> HAKIM: [W]ell, every time I've ever needed you, you've helped me, so . . .
>
> GILMORE: Uh-huh.  So you just basically want to get uh, get that street undedi, undedicated?

---

[13] Ex. 20T, at 5-6.

[14] Another councilman apparently had "made a couple of calls for [Hakim]," and Gilmore did not have his "hand on it."  *Id.*

[15] *Id.* at 12-13.

No. 13-31604

HAKIM: Yeah. And you just tell me what I need to do and as always I'll do it.

GILMORE: Alright.[16]

The conversation then changed from business to family, with Hakim asking about Gilmore's family, and reminding him that he had paid for an anniversary meal between Gilmore and his wife.[17] After they settled the restaurant bill, Hakim turned back to the fact that Gilmore had used a different printer for his campaign needs, saying that he would have taken care of the printing bill. He then gave Gilmore a $1,000 contribution:

HAKIM: All you got to do is call.

GILMORE: Yeah I know, yeah I, I had forgotten what mine, until I got to the last one. The last one was a mail out to everyone [to] thank you for voting for me. I said I'll just call, I said, well hell, well I've done paid all these right now.

HAKIM: Are you, are you got it all paid out?

GILMORE: All paid out. All paid out. But I'm still taking campaign contributions.

HAKIM: Are you?

GILMORE: Yeah.

HAKIM: I told you I had brought it.

GILMORE: Well, I certainly appreciate it.

HAKIM: 1,000 I told you.

GILMORE: I certainly appreciate it.

HAKIM: I've never left you alone.

GILMORE: Alright, well . . .

HAKIM: And all I ask for is a fair shake and you do something for me.

GILMORE: No problem.[18]

---

[16] *Id.* at 24-25.
[17] *Id.* at 28.
[18] *Id.* at 50-51.

5

No. 13-31604

After some brief discussion about the mechanics of the development deal, Hakim and Gilmore said their goodbyes. Hakim's $1,000 payment was not reported as a campaign contribution on Gilmore's campaign finance reports.[19]

## B.

Gilmore and Hakim's second conversation, nearly eighteen months later on August 25, 2009, was much shorter. Gilmore, an earlier phone call from Hakim, began by updating Hakim on a proposal pending in the city council to ratify an amendment to a contract between one of Hakim's companies and the city.[20] Gilmore then asked a favor:

GILMORE: Okay then. Good deal. Alright I had…

HAKIM: How's…

GILMORE: huh?

HAKIM:….how's everything been going?

GILMORE: Everything been going fine. I needed your help uh, on something uh..

HAKIM: Sure.

GILMORE: I got a constituent who, uh, about to be, have her utilities disconnected because of a high utility bill.

HAKIM: Uh-huh

GILMORE: It ain't the bill that's high. It ain't paid it in, been paying on the bill, ain't never paid the whole damn thing. So, it done got to be three hundred and something dollars now. I got a hundred of it. Trying to see if I could get the 207 from you.

HAKIM: Yeah. I…

---

[19] R. 6433.
[20] *See* Ex. 137T at 1.

No. 13-31604

GILMORE: Make it, make it, make it payable to Entergy. 'Cause I ain't gonna give her no money. It might not get to Entergy.

HAKIM: Well, I'd rather give it to you and then you do it, what you need to do it.

GILMORE: Oh, okay then. Well if you want to just go ahead and make it payable to Entergy, that'll be fine and I'll just pick it up.

HAKIM: Alright, I'll, I'll give you a call back later, when I'm back in the office.[21]

That evening, the council approved the contract amendment, and Hakim gave Gilmore the $207 a couple of days later.[22]

## II.

## A.

On appeal, Gilmore argues that he was entitled to a jury instruction on entrapment.[23] "We review *de novo* a district court's refusal to offer an instruction for a criminal defense that, if credited, would preclude a guilty verdict."[24] Because "the defendant is entitled to an entrapment instruction if he presents 'evidence sufficient to support a reasonable jury's finding of entrapment,' . . . we construe the evidence and make inferences in the light most favorable to the defendant."[25] If there is "evidence sufficient to support a

---

[21] *Id.* at 2-3.

[22] Ex. 145T.

[23] Gilmore requested an entrapment jury instruction before trial, but the district court did not provide such an instruction when charging the jury. *See* R. 1774, 6775-94. During jury deliberations, the jury sent a note asking for a definition of entrapment. *Id.* at 6797. After a discussion about whether an instruction was warranted, the court gave part of the Fifth Circuit pattern instruction on entrapment, it defined the substantive elements of the defense, but did not mention that the government bore the burden of proof in response to such a charge. *Id.* at 1836.

[24] *United States* v. *Theagene*, 565 F.3d 911, 917 (5th Cir. 2009).

[25] *Id.* at 919 (quoting *United States* v. *Guiterrez*, 343 F.3d 415, 419 (5th Cir. 2003)).

No. 13-31604

reasonable jury's finding of entrapment," the refusal of the district court to give an entrapment instruction is reversible error.[26]

The essential question for an entrapment defense is "whether criminal intent originated with the defendant or with the government agents."[27]  In order to warrant a jury instruction of entrapment, a defendant must "make a *prima facie* showing of [both] (1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense."[28]  In making this threshold demonstration, the defendant must make "some showing" of both elements, although our cases have conceded that the "consideration of the two factors often overlaps."[29]  We consider each element in turn.

## B.

The first factor, predisposition, focuses on "whether the defendant intended, was predisposed, or was willing to commit the offense *before first*

---

[26] *Id.*

[27] *United States* v. *Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997); *see also Jacobson* v. *United States*, 503 U.S. 540, 548 (1992) ("In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute."); *Guiterrez*, 343 F.3d at 419 ("The core question regarding entrapment is whether the criminal intent originally resided in the defendant; in other words, whether the government planted the seed of criminality, or instead whether the defendant was willing to perpetrate the offense and the government simply provided the opportunity.").

[28] *Theagene*, 565 F.3d at 918 (citing *Bradfield*, 113 F.3d at 521).

[29] *Id.* at 919 ("[A] court assessing the availability of the entrapment defense must consider whether the record contains 'sufficient evidence of both inducement and lack of predisposition,' but the two prongs ultimately go to the same showing: 'the defendant must show evidence that provides, at the least, a basis for a reasonable doubt on the ultimate issue of whether criminal intent originated with the government' as opposed to the defendant.") (quoting *Bradfield*, 113 F.3d at 521); *see also United States* v. *Ogle*, 328 F.3d 182, 187-88 (5th Cir. 2003) (requiring defendant to produce "substantial evidence" of inducement or a lack of predisposition in order to get an entrapment instruction).

*being approached by government agents.*"[30]  We have not identified specific elements that are either necessary or sufficient to a predisposition finding, though our cases have focused on four relevant considerations.

First, we look to the attitude of the defendant.  "Evidence of predisposition can include . . . active, enthusiastic participation or demonstrated expertise in the criminal endeavor," while "[a] lack of predisposition can appear from, for example, lack of prior interest or experience related to the crime, significant hesitation or unwillingness, or attempts to return discussion to lawful conduct."[31]  Second, the personal characteristics of the defendant are relevant, as our circuit has considered such factors as "desire for profit . . . [and] the character of the defendant, including past criminal history."[32]  Third, in the context of bribery cases, we have also looked to whether there is evidence that the defendant intended the payment in question to be a bribe.[33]  Finally, we have looked into whether the defendant has presented a "plausible innocent explanation for accepting the money and other gifts offered to him."[34]

Considering these four factors, Gilmore fares relatively well.  Taking all inferences in his favor, as we must, a reasonable jury could conclude he was not predisposed to bribery.  We look first at Gilmore's attitude, and ask

---

[30] *Bradfield*, 113 F.3d at 522; *see also Matthews*, 485 U.S. at 63 ("Predisposition, the principal element in the defense of entrapment, focuses upon whether the defendant was an unwary innocent, or, instead, an unwary criminal, who readily availed himself of the opportunity to perpetuate the crime.") (internal citation and quotation marks omitted).

[31] *Theagene*, 565 F.3d at 919-20; *see also United States* v. *Cavazos*, 162 F.3d 1160, at *5 (5th Cir. 1998) (unpublished) ("Many factors may indicate a defendant's predisposition, including a showing of defendant's desire to profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation.") (quoting *United States* v. *Chavez*, 119 F.3d 342, 346 (5th Cir. 1997)).

[32] *United States* v. *Reyes*, 239 F.3d 722, 739 (5th Cir. 2001).

[33] *See Theagene*, 565 F.3d at 920-22.

[34] *United States* v. *Nelson*, 732 F.3d 504, 515 (5th Cir. 2013).

whether he was active and enthusiastic or whether he was hesitant, unwilling, or attempted to steer the conversation to lawful conduct.[35]  This factor cuts slightly against Gilmore.  In the March 26, 2008, conversation Gilmore shows neither marked enthusiasm nor trepidation – Hakim generally steered the conversation to proposed zoning actions, but Gilmore showed little hesitation once the discussion had landed on those topics.[36]  Gilmore also informed Hakim that he was still accepting campaign contributions, albeit after Hakim first moved the conversation to that topic, and accepted the offered $1,000 by saying that he "appreciated it."[37]  Similarly, in the August 28, 2009, conversation, Gilmore actively solicited $207 from Hakim to pay a constituent's utility bill.[38]  In neither case did Gilmore show reluctance, and in the latter incident he actively solicited funds, and so the attitude factor cuts against him – though since he could not be said to be truly enthusiastic, it cuts only slightly.

Second, we look to Gilmore's personal characteristics, including whether he had a past criminal history or an obvious desire for personal profit.[39]  Here, there is no evidence in the appellate record that Gilmore has a criminal record.[40]  Nor is the desire for improper profit obvious – Gilmore could have intended the 2008 payment to be what it was called, a campaign contribution, rather than a bribe.  Moreover, Gilmore wanted the 2009 payment to be delivered directly to the utility company, not to him, and a jury could determine that such behavior indicates a lack of personal pecuniary motive.  These examples fall far below other profit-seeking impulses this court has found

---

[35] *See, e.g.*, *Theagene*, 565 F.3d at 919-20.

[36] *See, e.g.*, Ex. 20T at 15, 19, 24.

[37] *Id.* at 50-51.

[38] *See* Ex. 137T at 2-3.

[39] *Reyes*, 239 F.3d at 739.

[40] In fact, Gilmore focused much of his case at trial on presenting various witnesses who could attest to his good character.  *See generally* R. 6642-6812.

relevant to a ruling of no-predisposition, such as, for example, when the defendant "stated that he expected to receive a substantial windfall" from the activities in question.[41] This factor thus cuts in Gilmore's favor.

The final two factors are related. The third asks whether there is evidence that the defendant intended the money in question to be a bribe, as opposed to a legitimate payment.[42] In this case, the first payment could have been perceived to be only a campaign contribution (albeit one that appears to have been in violation of campaign finance rules), rather than as a bribe. That is especially true where, as here, an FBI agent testified that Hakim, the government agent, considered the money to be a campaign contribution.[43] The second payment, to the constituent, via Gilmore, could also be interpreted as an attempt to help a constituent rather than to enrich or benefit himself. This factor points slightly in favor of Gilmore. The fourth factor is whether the defendant has a "plausible innocent explanation for accepting the money and other gifts offered to him."[44] Here, there is: that the money framed as a campaign contribution, was, in fact, just a campaign contribution, albeit an improper one, without an illegal *quid pro quo*, and that the constituent payment was intended by Gilmore only to go to the constituent, without enriching himself. This is not a necessary conclusion, but we have only required a "plausibly" innocent explanation before allowing an entrapment defense to reach the jury on predisposition grounds.[45]

---

[41] *Reyes*, 239 F.3d at 740.

[42] *See Theagene*, 565 F.3d at 920-22.

[43] R. 6362 ("Q: Now, this [2008] meeting took place where the thousand dollars was given – which Mr. Hakim considered a campaign contribution, correct? A [FBI]: Yes."); *see also Theagene*, 565 F.3d at 921 (evidence that government official did not consider payment to be a bribe is relevant to a finding of no predisposition).

[44] *United States* v. *Nelson*, 732 F.3d 504, 515 (5th Cir. 2013).

[45] *United States* v. *Smith,* 547 F. App'x 390, 394-95 (5th Cir. 2013) (unpublished); *see also Theagene*, 565 F.3d at 920-21 (ruling that a $500 cash payment to the IRS with a post-it entitled "a token" was not necessarily not-innocent).

No. 13-31604

With three factors either neutral or in favor of Gilmore, and only one against, we conclude that a reasonable jury, looking the evidence in the light most favorable to the defendant, could find that Gilmore was not predisposed to commit the two bribery acts of which formed the basis for his conviction.

C.

In order to garner an entrapment instruction, Gilmore must also make a showing that a reasonable jury could determine that he was induced to commit the offenses in question by the government. This he cannot do.

Inducement looks at "the creative activity of law enforcement in spurring an individual to crime."[46] Here, the line between permissible and impermissible actions is a blurry one. Our doctrine is clear that undercover operations or "artifice and stratagem" conceived by a state agent are not inducement, even when contact was initiated by the government.[47] Nor are situations where the government provides an opportunity to commit a crime, without affirmatively pushing the defendant to actually participate.[48] Instead, we have held that conduct can rise to the level of inducement where the government has taken "either threatening or harassing conduct or actions designed specifically to take advantage of the defendant's weaknesses."[49] Such forbidden conduct can include "'[p]ersuasion or mild coercion' and 'pleas based on need, sympathy, or friendship.'"[50] Also unacceptable are situations where

---

[46] *Theagene*, 565 F.3d at 922 (quoting *Guiterrez*, 343 F.3d at 420).

[47] *Id.* (quoting *United States* v. *Ogle*, 328 F.3d 182, 185 (5th Cir. 2003)).

[48] *See United States* v. *Brown*, 521 F. App'x 323, 326 (5th Cir. 2013) (unpublished) (quoting *Guiterrez*, 343 F.3d at 419-20); *see also United States* v. *Calmes*, 574 F. App'x 295, 302 (5th Cir. 2014) (unpublished) (looking to whether defendant "presented . . . evidence to show the [illegal idea] . . . came from the Government.").

[49] *Guiterrez*, 343 F.3d at 420.

[50] *Theagene*, 565 F.3d at 922 (quoting *United States* v. *Nations*, 764 F.2d 1083, 1080 (5th Cir. 1985)); *see also id.* ("The brother-in-law, who was working as an informant, appealed to Nations [to transport stolen vehicles] with 'a tale of financial woes, the need to support a new spouse, and terminal cancer, all the while knowing that Nations' sister recently had died of cancer.'") (quoting *Nations*, 764 F.2d at 1080).

No. 13-31604

"government agents persist in encouraging criminality after a defendant rejects overtures," such as making repeated phone calls to encourage a defendant to commit a drug deal.[51]  In evaluating these government actions, we have also looked at the power imbalance between agent and defendant, and have been more willing to find inducement when the relationship was such that the defendant could not walk away from the agent.[52]

These general standards are best illustrated by specific examples, and in *United States* v. *Gutierrez*, we favorably cited the First Circuit's decision in *United States* v. *Gendron*,[53] which listed seven contexts where federal appellate courts have found inducement:

> Courts have found a basis for sending the entrapment issue to the jury (or finding entrapment established as a matter of law) where government officials: (1) used intimidation and threats against a defendant's family, (2) called every day, began threatening the defendant, and were belligerent, (3) engaged in forceful solicitation and dogged insistence until defendant capitulated, (4) played upon defendant's sympathy for informant's common narcotics experience and withdrawal symptoms, (5) played upon sentiment of one former war buddy for another to get liquor (during prohibition), (6) used repeated suggestions which succeeded only when defendant had lost his job and needed money for his family's food and rent, (7) told defendant that she (the agent) was suicidal and in desperate need of money.[54]

While we caution that this list is neither exhaustive nor exclusive, it does illustrate the type of government behavior we have held unacceptable.

---

[51] *Id.* at 922-23.

[52] *See id.* at 923-24 (noting that while "[a] hesitant target of a sting can often walk away (literally or figuratively) from a potential inducer," if the defendant had to deal with the agent, an entrapment jury instruction was more reasonable).

[53] 18 F.3d 955 (1st Cir. 1994).

[54] *Gutierrez*, 343 F.3d at 420 n.13 (quoting *Gendron*, 18 F.3d at 961-62) (internal quotation marks, citations, ellipses, and brackets omitted).

No. 13-31604

With this as our factual benchmark, we ask whether a reasonable jury could conclude that the government's actions toward Gilmore qualified as inducement. Gilmore's primary argument is that he was induced because the government, not Gilmore, originally came up with the idea of the $1,000 contribution.[55] This claim fails – as we have held repeatedly, the mere fact that the government conceived of the sting operation does not convert a proper law enforcement activity into an improper inducement.[56]

With this per se argument unavailable, we must then look at the full context of Hakim and Gilmore's interactions. Gilmore's best argument lies in the March 2008 lunchtime conversation. There, he can point to the fact that Hakim carried the conversation and was the first to request help from Gilmore. He also initiated the general discussion about campaign contributions, and while Gilmore did say "I'm still accepting campaign contributions," it was only after Hakim had turned the discussion to fundraisers and had implied that he had a contribution to give.[57] This situation differs from the classic sting scenario where the government only passively provides the opportunity; here, Hakim played a more active role in affirmatively asking for help and then mentioning that he had a contribution to give. Inasmuch as we have previously held that the defendant must show only "some government involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense,"[58] Hakim's questions about Gilmore's campaign financing could be seen as "more substantial" than passively providing a platform for bribery.

---

[55] *See* Appellant's Br. 11-12, 16.

[56] *See Guiterrez*, 343 F.3d at 420 ("It is proper (i.e., not an 'inducement') for the government to use a 'sting,' at least where it amounts to providing a defendant with an 'opportunity' to commit a crime.") (quoting *Gendron*, 18 F.3d at 961).

[57] *See* Ex. 20T at 33-34, 50.

[58] *United States* v. *Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997).

No. 13-31604

This is not enough. In light of how our cases have interpreted the inducement prong, we cannot conclude that Gilmore was entrapped. First, after a careful review of the record, we cannot find evidence that Hakim threatened or harassed Gilmore – rather, he brought up campaign contributions, implied that he had one to make, and Gilmore followed up. Nor did Hakim persuade, pressure or coerce Gilmore to take the contribution, instead, Gilmore, by all appearances, was quite appreciative of the payment once it was offered to him.[59] Second, Gilmore never rejected any of Hakim's overtures – when Hakim offered the contribution, Gilmore took it without objection.[60] Third, we note that there was no particular power imbalance between Hakim and Gilmore. Both were apparently respected members of their community, and there was not the type of unbalanced dynamics, such as in *Theagene*, between an auditing IRS agent and a defendant who owed money to the tax authorities, that would have made it difficult for Gilmore to terminate the conversation.[61] Finally, we note that the interactions between Gilmore and Hakim are different in kind, not just in degree, from the persistent, intimidating contacts highlighted in *Gendron* and *Guiterrez*.

Nor does Gilmore and Hakim's second conversation, in late 2009, show inducement. There, Gilmore initiated the call, initiated the discussion about Hakim's pending contract modification, and initiated the request for $207 to pay a constituent's utility bill. The conversation in question shows no

---

[59] *See* Ex. 20T at 50-51 ("HAKIM: Are you, are you sure you got it all paid out? GILMORE: All paid out. All paid out. But I'm still taking campaign contributions. HAKIM: Are you? GILMORE: Yeah. HAKIM: I told you I had brought it. GILMORE: Well, I certainly appreciate it.").

[60] *See id.*; *see also Theagene*, 565 F.3d at 922-23. Our decisions have focused on whether the defendant resisted the entreaties of the government agent. *See Theagene*, 565 F.3d at 923 ("During the phone call, interpreted in the light most favorable to Theagene, [the government agent] moved the discussion to bribery, and persisted in steering the conversation that way despite resistance.").

[61] *See Theagene*, 565 F.3d at 923-24.

15

indication of threatening or harassing conduct on the part of the government; in this case, the government is a passive player. There is one complication – Gilmore requested that the money be paid directly to the utility company, while Hakim said he would rather pay it to Gilmore directly. This is of no legal consequence – while the form of the payment might be relevant to whether it was a bribe, it is not relevant to whether Gilmore was induced or pressured into taking it. Moreover, even if the form of payment was relevant for inducement purposes, Gilmore accepted the cash funds readily, without the type of overcome objection that is necessary as per *Theagene* and *Guiterrez.*

Accordingly, we conclude that Gilmore has not made a prima facie showing that a reasonable jury could find that he was induced to take the bribes in question, and hold that he was not entitled to an entrapment jury instruction.[62]

### D.

Gilmore also argues that he was substantively entrapped, such that he is entitled to a judgment of acquittal notwithstanding the fact that the jury was not given an entrapment instruction. We dispatch this argument quickly. In *United States* v. *Stephens*,[63] we held that where a defendant could not establish a prima facie case that he was entrapped, he could not prevail on an argument that there was insufficient evidence to show that he was not entrapped.[64] So here.

---

[62] Given our conclusion, we need not reach the issue of whether the incomplete entrapment instruction given by the district court was adequate.

[63] 717 F.3d 440 (5th Cir. 2013).

[64] *Id.* at 445.

No. 13-31604

III.

Gilmore also challenges the sufficiency of the evidence used by the government to prove that he violated the substantive criminal act for which he was indicted, in this case RICO.  This challenge fails.

A.

The Government brought charges against Gilmore for violating 18 U.S.C. § 1962(c), which states that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.[65]

To prove a violation of this statute, the Government must establish: "(1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was employed by or associated with the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through a pattern of racketeering activity."[66]  A pattern of racketeering activity, in turn, includes "any act . . . involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year,"[67] and "requires at least two acts of racketeering activity."[68]  The government must also prove " (1) that the racketeering acts are related [to each other] (2) [and] that they amount to or pose a threat of continued criminal activity."[69]

---

[65] 18 U.S.C. § 1962(c).

[66] *United States* v. *Posada-Rios*, 158 F.3d 832, 855 (5th Cir. 1998) (quoting *United States* v. *Erwin*, 793 F.2d 656, 670 (5th Cir. 1986)) (internal quotation marks omitted).

[67] 18 U.S.C. § 1961(1)(A).

[68] *Id.* § 1961(5).

[69] *United States* v. *Delgado*, 401 F.3d 290, 298 (5th Cir. 2005) (citing *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

No. 13-31604

In this case, the substantive predicate acts were bribery accusations brought under Louisiana Revised Statute § 14:118, which states that "[p]ublic bribery is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to [among others, an elected or appointed public official], with the intent to influence his conduct in relation to his position, employment, or duty."[70]  As is relevant here, a public official can commit bribery through "[t]he acceptance of, or the offer to accept, directly or indirectly, anything of apparent present or prospective value [by a public officer or employee], shall also constitute public bribery."[71]  An individual who violates this statute is subject to imprisonment for not more than five years.[72]

In his brief, Gilmore challenges his conviction on two grounds: (1) that there was inadequate showing that the two bribery events – the $1,000 and $207 payments – established a threat of continuing racketeering activity, and (2) that the government failed to prove that the two payments were, in fact, bribes.[73]

B.

As an initial matter, the parties dispute the relevant standard of review. Gilmore argues that the relevant standard is sufficiency of the evidence,[74] which asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[75]  This is a "highly deferential" standard of review, where the court looks to whether the "jury's

---

[70] La. R. S. § 14:118(A)(1); *see also* R. 45, 48.

[71] La. R. S. § 14:118(A)(2).

[72] *Id.* § 14:118(C)(1).

[73] *See* Appellant's Br. 20.

[74] *Id.* at 18.

[75] *Jackson* v. *Virginia*, 443 U.S. 307, 320 (1979).

verdict was reasonable, not whether we believe it to be correct."[76]  The government, in turn, argues that because Gilmore's motion for judgment of acquittal insufficiently preserved his claim, the proper standard is manifest miscarriage of justice,[77] where a verdict is affirmed unless the "record is devoid of evidence pointing to guilt or because the evidence on a key element of the offense is so tenuous that a conviction would be shocking."[78]

"To preserve de novo review [and thus be entitled to appellate review under a sufficiency of the evidence standard] . . . a defendant must specify at trial the particular basis on which acquittal is sought so that the Government and district court are provided notice."[79]  During trial, Gilmore orally moved for a judgment of acquittal, without explanation.[80]  After the verdict, he renewed his motion, focusing on whether the evidence was sufficient to show whether (a) Gilmore had the specific intent to commit bribery; (b) Gilmore demanded money from Hakim in return for a *quid pro quo*; (c) the racketeering acts of which Gilmore was convicted were related, and (d) whether the racketeering acts were sufficient to sustain a RICO conviction.[81]  The government concedes that this motion was sufficient to put it on notice for the question of whether the racketeering acts met the definition of bribery, the first point Gilmore challenges, but argues that the question of whether these acts

---

[76] *United States* v. *Gulley*, 526 F.3d 809, 816 (5th Cir. 2008) (quoting, first, *United States* v. *Harris*, 293 F.3d 863, 869 (5th Cir. 2002), and, second, *United States* v. *Williams*, 264 F.3d 561, 576 (5th Cir. 2001)).

[77] Appellee's Br. 58-59.

[78] *United States* v. *McDowell*, 498 F.3d 309, 312 (5th Cir. 2007) (quoting *United States* v. *Knezek*, 964 F.2d 394, 400 n.14 (5th Cir. 1992)) (internal quotation marks, brackets, and ellipses omitted).

[79] *Id.*

[80] *See* R. 6613, 6772.

[81] R. 1850.

"establish a threat of continuing racketeering activity," the second prong of Gilmore's second ground for acquittal, is new.[82]

We have held that where, as here, the defendant timely files a motion for a judgment of acquittal and "asserts specific grounds for a specific element of a specific count . . . he waives all others for that specific count."[83]  In this case, Gilmore's motion for a judgment of acquittal attacked his RICO conviction on several fronts, but never mentioned or implied an issue with whether the two predicate acts established a threat of continuing racketeering activity.[84] Accordingly, we apply a sufficiency of the evidence standard to the question of whether the payments were bribes and whether the acts were connected to one another and a miscarriage of justice standard to the question of whether the racketeering acts represented a continued threat.  In any event, Gilmore cannot pass muster under either standard.

## C.

The first issue is whether the two payments made by Hakim to Gilmore met the statutory definition of bribes.  In his brief, Gilmore's argument with respect to both payments is that they were not bribes because neither Gilmore nor Hakim directly mentioned any city projects in the context of the payments.[85]  As an initial matter, the requirement which Gilmore apparently infers – that the payment must be directly and clearly related to an acceptance by the public official for purposes of influencing his conduct – finds no comfort

---

[82] Appellee's Br. 59.

[83] *United States* v. *Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) (quoting *United States* v. *Herrera*, 313 F.3d 882, 884 (5th Cir. 2002) (en banc)).

[84] *See* R. 1849-58.

[85] *See* Appellant's Br. 21 ("Though Mr. Hakim and Mr. Gilmore mentioned a number of projects during the public lunch meeting, there was no relation to the $1,000 campaign contribution and any city business discussed at or before the lunch, as the FBI admittedly had set this transaction up independently of the conversation."); *id.* at 22 ("Though Mr. Hakim and Mr. Gilmore mentioned city council business, the $207 was not related to any of these transactions.").

in the statutory language.  Rather, the statute is clear that a bribe can include the "giving or offering to give, *directly or indirectly*, anything of apparent or prospective value."[86]

Here, there is sufficient evidence, taking all inferences in favor of the government, as we must, that both payments meet Louisiana's broad statutory definition of a bribe.  First, in contextualizing his interactions with Gilmore, Hakim testified that, on a fairly regular basis, he would provide money to Gilmore in exchange for certain government related favors.[87]  Next, with regard to the $1,000 payment, at the meeting where Hakim gave the money to Gilmore, the pair discussed several of Hakim's real estate developments, and Hakim made clear that he needed Gilmore's help to get various measures passed through the city council.[88]  Finally, immediately after providing the $1,000 contribution to Gilmore, Hakim said that "all I ask for is a fair shake and you do something for me," to which Gilmore replied "[n]o problem."[89]  Given this evidence, the jury could reasonably have found that Gilmore accepted this money to influence his official conduct.

Second, turning to the $207 utility payment, the Government presented evidence at trial indicating that Gilmore was the first to suggest the utility payment.  He also did so after reminding Hakim that there was a council vote on an issue of concern to him that evening.[90]  Gilmore acknowledges this timing in his brief.[91]  Finally, after Gilmore accepted the $207 payment, he told Hakim

---

[86] La. R. S. § 14:118(A)(1) (emphasis added).

[87] *See* R. 6428 ("Q: And when you [Hakim] said, 'You tell me what I need to do, and, as always, I'll do it,' what were you referring to?  A [Hakim]: Whatever he needed, I would take care of it. Q: Whatever he asked for?  A: Money.").

[88] *See* Ex. 20T.

[89] *See id.* at 51.

[90] *See* Ex. 137T at 1.

[91] Appellant's Br. 22.

No. 13-31604

that "it went good the other night,"[92] a potential reference to the city council vote. While it is certainly not inevitable for a juror to conclude that this evidence indicated some sort of prohibited *quid pro quo* bribery, we hold that a reasonable juror could conclude that they did so indicate.

D.

Gilmore also argues that the Government failed to prove that the two bribery predicate acts were related and constituted a threat of continued criminal activity.[93]

The first question is whether the two predicate bribery acts are related. This is not a high bar – in *United States* v. *Delgado*, for example, we have held that acts are related so long as the acts are "committed in furtherance" of the enterprise, or if they had the same purpose.[94] Here, for example, the jury could conclude bribes were related in that they were all focused on the same councilman, Gilmore, and were all provided to secure favorable treatment to

---

[92] Ex. 145T.

[93] We recognize that this argument composes only a couple of sentences of Gilmore's appellate brief, and the argument that there was proof that the two acts constituted a threat of continuing activity is treated only to a conclusory statement, devoid of any reasoning. *See* Appellant's Br. 20 ("That is, there is no indication that accepting a $1,000 campaign contribution in February or March 2008 – an idea formulated solely by the FBI, not by Eddie Hakim or Arthur Gilmore, Jr., is [in] any manner related to/or a pattern of racketeering activity associated with requesting a $207 check made payable to Entergy, to ensure that a constituent's electric bill was paid in August 2009. Further, there was no proof that these two acts established a threat of continuing racketeering activity.").

We have repeatedly held that "[q]uestions posed for appellate review but inadequately briefed are considered abandoned." *Smith* v. *Lonestar Const., Inc.*, 452 F. App'x 475, 476 (5th Cir. 2011) (unpublished) (quoting *Dardar* v. *Lafourche Realty Co., Inc.*, 985 F.2d 824, 831 (5th Cir. 1993)). As such, a fair read of this argument – at least with respect to the second prong of continuing criminal activity – is that it has been waived. As discussed above, though, even were we to find the argument had not been waived, it still fails. *See United States* v. *Martinez*, 263 F.3d 436, 439 n.1 (5th Cir. 2001) (concluding that a claim had been waived, but holding that "[e]ven if we were to accept that such a claim . . . was not waived, the claim would fail").

[94] 401 F.3d 290, 298 (2005). In *Delgado*, the acts were related because they were "committed in furtherance of [the enterprises] business." *Id.*; *see also United States* v. *Herrera*, 468 F. App'x 409, 419 (5th Cir. 2012) (unpublished) (same).

22

the same businessman, Hakim. Given the favorable inferences this court must draw in favor of the government, we find that a rational juror could make this conclusion.

The second question relates to whether the acts constituted a threat of continued criminal activity. In *H.J Inc.* v. *Northwestern Bell Telephone Co.*, the Supreme Court laid out several principles for interpreting this requirement:

> "Continuity" is both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. . . . A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement. Congress was concerned in RICO with long-term criminal conduct.[95]

Here, the Government provided evidence indicating that Hakim and Gilmore had a long-term relationship which, if Hakim is to be believed, embodied a *quid pro quo* between money and political favors in violation of state law. There is no indication that the two bribery acts were isolated, and, indeed, Hakim testified to a multi-year "pay to play" relationship, which existed before the two predicate acts had occurred, and future development projects, which thus would continue on past the predicate acts of which Gilmore was convicted.[96] This evidence – especially given the "manifest injustice" standard governing our review of this element – supports a jury finding of continuity.

---

[95] 492 U.S. 229, 241-42 (1989).
[96] *See* R. 6377-78, 6380-82, 6387-88, 6452.

No. 13-31604

IV.

For the aforementioned reasons, we AFFIRM Gilmore's conviction on all grounds challenged in this appeal.